CHARLES J. COHEN, Respondent, v. THE BERLIN & JONES ENVELOPE COMPANY, Appellant, Impleaded with Others.

38   499
r166a292

*Contract — restraint of trade — protection against a ruinous competition is not illegal.*

In an action brought to recover damages for the breach of a contract by which the defendants agreed to purchase from the plaintiff, 250,000 envelopes daily, at prices to be fixed by the Standard Envelope Company, which was controlled by the defendants, and by which the plaintiff covenanted not to sell envelopes at a less price than that at which the defendants had covenanted to purchase, it appeared that the Standard Envelope Company was not organized for the purpose of stifling competition, but only for the purpose of protecting the envelope trade against a ruinous competition, and to insure a living profit to the people engaged therein; that there were nineteen competing concerns who were able to keep the price within the range of fair dealing, and that the prices of envelopes were not raised beyond the point necessary to yield a reasonable profit. It further appeared that the contract did not operate in restraint of the plaintiff's production, as 250,000 envelopes was the full capacity of his plant and as he had never been able to sell that number. *Held*, that the court was authorized to submit to the jury the question whether the steps taken, or which might have been taken, under the contract, operated in restraint of trade or were inimical to public policy; and that a verdict in favor of the plaintiff would not be disturbed.

APPEAL by the defendant, The Berlin & Jones Envelope Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on

the 2d day of July, 1898, upon the verdict of a jury, and also from an order entered in said clerk's office on the 30th day of June, 1898, denying said defendant's motion for a new trial made upon the minutes.

This appeal was transferred from the first department to the second department.

The action was brought to recover damages resulting from the breach by the defendants of their agreement to purchase from the plaintiff 250,000 envelopes, daily, at prices to be in conformity with chedules to be issued from time to time by the Standard Envelope Company, which company was recited in the agreement to be under the control of the defendants. The contract further provided that the plaintiff should not sell envelopes at a less price than that at which the defendants had covenanted to buy.

*Robert Thorne* [*Robert W. De Forest* with him on the brief], for the appellant.

*Samuel Untermyer* [*Louis Marshall* with him on the brief], for the respondent.

HATCH, J. :

The contract which is the subject of this action was reviewed by the Appellate Division in the first department upon a demurrer interposed to the plaintiff's complaint, and the court held, in affirmance of the court at Special Term, that it did not appear upon the face of the contract that it was illegal as being in restraint of trade or for any other reason. (*Cohen* v. *Berlin & Jones Envelope Co.,* 9 App. Div. 425.) We think that the determination of the court upon such review was correct, and have no hesitation in adopting the doctrine therein announced. Upon this appeal it is insisted that, even though the former decision be correct, yet the evidence given on the trial establishes that the contract is not enforcible, as it was entered into for the purpose of stifling competition, enhancing prices and restraining production. In support of this contention, the defendants mainly rely upon three cases decided by the Court of Appeals. (*People* v. *Milk Exchange,* 145 N. Y. 267; *Judd* v. *Harrington,* 139 id. 105, and *People* v. *Sheldon,* 139 id. 251.) The first two of these cases determined that the contracts there under

consideration were void as matter of law, for the reason that they were inimical to trade and commerce, and, therefore, infringed upon the public policy of the State. In both the facts were conceded, and in both the court disposed of the question as one of law. The third case was prosecuted by an indictment for conspiracy, and the court held that the contract was inimical to trade and commerce, and upon proof of overt acts under it the defendants were properly convicted. The rule of law established by these cases is the same, and may be stated to be that where the agreement deals with an article of prime necessity to the people, seeking through its terms to prevent competition in trade therein and control the market price of the article, it invades the sanctity of a sound public policy and is, therefore, void. The test of such an agreement is not what has been, but what may be, done thereunder, and if it may operate to the hurt of trade and to the prejudice and injury of the public, it falls under condemnation. These cases, however, do not hold that all contracts in restraint of trade are void, nor is such rule the law. Agreements which have for their purpose the realization of a fair price for the product manufactured and sold, do not contravene any rule of public policy, even though in some respects they operate in restraint of trade. In the *Sheldon Case (supra)* it was said by Judge ANDREWS: "The obtaining by dealers of a fair and reasonable price for what they sell does not seem to contravene public policy, or to work an injury to individuals. On the contrary, the general interests are promoted by activity in trade, which cannot permanently exist without reasonable encouragement to those engaged in it. Producers, consumers and laborers are alike benefited by healthful conditions of business." (P. 263.) The distinction between the two classes of contracts is admirably stated by Judge GRAY in *Leslie* v. *Lorillard* (110 N. Y. 519, 533), where the learned judge says: "When, therefore, the provisions of agreements in restraint of competition tend beyond measures for self protection, and threaten the public good in a distinctly appreciable manner, they should not be sustained. The apprehension of danger to the public interests, however, should rest on evident grounds, and courts should refrain from the exercise of their equitable powers in interfering with and restraining the conduct of the affairs of individuals or of corporations, unless their conduct, in some tangible form, threatens the wel-

fare of the public." This doctrine is abundantly supported in *Diamond Match Co.* v. *Roeber* (106 N. Y. 473); *Vinegar Co.* v. *Foehrenbach* (148 id. 58); *Drake* v. *Siebold* (81 Hun, 178), and *Matthews* v. *The Associated Press* (61 id. 199). There is nothing in the Penal Code or in the statutes of the State to which our attention has been invited which adds anything to the strength of the doctrine announced in the cases first cited, or which subtracts anything from the force of the limitation placed thereon by the cases last cited. The line of demarcation between the cases is reasonably plain, and it only remains to see into which class this case falls.

We have already seen that the contract upon its face does not merit condemnation. Has the testimony in the case aided to that end? It appeared upon the trial, at least for all purposes essential to support the verdict of the jury, that the business in which the plaintiff was engaged had fallen to a low ebb. To use the language of one of the witnesses for the defendants, "The competition in the wholesale trade was very close and severe; goods were being sold in New York by eastern manufacturers less than could be produced by New York manufacturers. Goods were sold in Philadelphia and in other places less than they could be produced and make a profit by the local manufacturers;" and he further stated that the trade was in such a demoralized condition that it was a question of bankruptcy or combination with many of them; that goods were selling below what it cost to produce them, and that the formation of the Standard Envelope Company was necessary as a measure of protection against ruinous competition; that the purpose of the agreement was to give the people engaged in the business a living profit, and was not to strangle competition or enhance prices beyond a point where a fair manufacturer's profit could be obtained; that at this time there were plenty of people engaged in this business who were not related to the Standard Envelope Company, either by contract or otherwise, but were in competition with it, and could keep the price within the range of fair dealing. In this connection it appeared that there were nineteen other concerns doing business in various parts of the country that were more or less in competition with the parties to this contract. It is true that some of the witnesses for the defendants stated that the contracting parties did not regard these people as competitors, but it is equally true that the character of the busi-

ness carried on by them showed that they were all more or less competitors, and some of them were shown to be substantial ones. There was substantive testimony, therefore, to show that the purpose of the contract was not to stifle competition or to unduly increase prices; and the conditions were such that the operation of the contract could not produce, in an appreciable degree, injury to the public, at least the jury were authorized so to find.

It is insisted that the clause of the contract whereby the plaintiff was to furnish 250,000 envelopes daily was not a sale and was not intended to be; and as the proof shows that no envelopes were delivered under it, it is conclusive of such fact. It is apparent that the number contracted to be sold was the full capacity of the manufactory. The plaintiff had never been able to sell this number of envelopes, so the contract did not operate in restraint of production. The plaintiff bound himself absolutely to deliver upon demand these envelopes in this volume, and it cannot be said that, because they were not demanded, the obligation of the contract was less or, because they were not so demanded, the public could suffer thereby. The plaintiff was not bound to manufacture under the contract to the whole extent of his capacity unless required, and it does not appear that the trade, either before or subsequent to the execution of the contract, demanded this quantity of envelopes either at the scheduled price or any price at which they had previously sold. If the arrangement were carried out it might well have been expected that the whole number would have been required; and if this condition existed then the plaintiff was bound to furnish, and not only to furnish but to pay at the rate of ten cents a thousand if he increased the production. Quite likely it is that the plaintiff, if he were able to dispose of this number of envelopes, would be willing to make this payment in return for the volume of business which he was able to do, if he could thereby manufacture and sell more, but nothing done under it, whether the demand was made or not, in anywise injuriously affected the public or could so affect it unless thereby the price was enhanced. But to a limited extent, and for the purpose of obtaining a reasonable profit, this was legitimate. The evidence does not show that the prices were raised beyond this point. Indeed, in some respects the price was reduced below what it was before the contract was made. Although the plaintiff was

bound to sell at schedule prices, yet it is not made to appear that any schedule of price could be fixed at which the goods could be disposed of and produce more than a reasonable profit under the circumstances surrounding the execution of this contract or during the time of its operation; and if this be so we see no reason why a jury might not find that it was not intended to unduly raise prices. When the plaintiff was first approached upon the subject of a combination, the proposition was to buy his business. It cannot be doubted but that the defendants had the right to buy out all the envelope manufacturing business, and consolidate the same even though they thereby obtained power to end competition and arbitrarily fix prices. Because some of these results flow from a combination where the parties remain the owners of the business, it does not necessarily follow that the combination is unlawful. It was held in *Oakes* v. *C. W. Co.* (143 N. Y. 430) that it was not unlawful, where competition was threatened, to contract with the competitor to abandon his enterprise and enter into employ with the established business. Upon principle there can be no distinction between such a contract and a combination of the same persons to run the business upon a standard agreed upon between them; and not only under this authority, but under those already cited, such agreements will be sustained, within the limitations already suggested.

The argument of the learned counsel for the defendants proceeds upon the theory that the contract is void upon its face. We do not feel called upon to follow him in this discussion, for the reason that the former decision is conclusive upon such question.

As to all the other questions, we think the court was authorized to submit, and the jury to find, that the steps taken or which might have been taken, under the contract, did not operate in restraint of trade and were not inimical to public policy. The court submittted the questions properly upon the law as we conceive it to be. The requests to charge if adopted by the court would have required it to direct a verdict in favor of the defendants; no error was, therefore, committed in this respect.

It was stated upon the argument that the plaintiff was required by the defendants to enter into this contract as a measure of protection for his own business against the further ruinous competition which would have been waged against him by the defendants. If this be

so, the defendants cannot call upon the courts to strain rules for their protection when they are sought to be held accountable for what they have produced. In such cases it may be that the parties do not stand *in pari delicto*. The borrower at usury was never regarded as occupying that relation to the lender. And so, where there is oppression upon one side and necessary submission upon the other, such relation does not exist. "When one holds the rod and the other bows to it," the holder cannot be heard to say that the contract thus forced is illegal. (Broom Leg. Max. [8th ed.] 724.) The record, however, does not clearly establish such relation, and we are, therefore, not called upon to say what the rule would be in such a case.

If our views be correct, it follows that the judgment should be affirmed.

All concurred.

Judgment and order affirmed, with costs.