DR. MILES MEDICAL CO. v. JOHN D. PARK & SONS CO.†

(Circuit Court of Appeals, Sixth Circuit. September 10, 1908.)

No. 1,797.

1. MONOPOLIES (§ 17*)—CONTRACTS IN RESTRAINT OF TRADE—SALE OF PROPRIETARY MEDICINE.

A system of contracts between the manufacturer of a proprietary medicine made in accordance with a secret formula but unpatented and all dealers authorized by it to handle such medicine, whether regarded as contracts of sale or agency, by which jobbers are prohibited from selling to any except retailers licensed by such manufacturer, and retailers are prohibited from selling to any save those licensed to buy or to persons buying for consumption only, and neither jobber nor retailer is permitted to sell except at prices imposed by the manufacturer, the purpose and effect being to maintain prices by preventing competition in price between either jobbers or retailers, where it affects interstate sales is illegal both at common law and under the federal anti-trust act of July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), as in restraint of trade.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. § 17.*]

2. SALES (§ 7*)—CONTRACTS—CONSTRUCTION—SALE OR BAILMENT.

Contracts between the manufacturer of a proprietary medicine and jobbers dealing in the same which purport to be consignment contracts and to make the jobbers agents for the manufacturer and provide that title to the goods shall remain in the manufacturer until they are sold by the jobber to purchasers whom it has licensed to buy the same and at prices fixed by it, but which obligate the jobbers to pay a fixed price for the medicine without the right to return it and under which the title is retained even after the price has been paid or "advanced," are mere subterfuges to disguise purchasers in the mask of agency and to evade the law which would make open contracts of sale with the same restrictions upon resale illegal as in restraint of trade, and are in fact contracts of sale and not of agency.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 16, 17; Dec. Dig. § 7.*]

Appeal from the Circuit Court of the United States for the Eastern District of Kentucky.

This is a bill by manufacturers of proprietary medicines who put them upon the market under a system of contracts intended to maintain the prices fixed by them. There are two forms of these contracts, one with wholesalers and another with retailers. Like contracts, it is claimed, have been made and signed by nearly all jobbers and retailers in the United States who deal in such goods. These contracts are set out at the close of the opinion.

The defendant company refuses to enter into any such agreement, and, according to the averment of the bill, illegally induces persons who have to violate their contracts by selling to him though unauthorized to buy and at prices below those which such persons are required to exact. It is also averred that for the purpose of protecting the seller from the consequences of a breach of contract the defendant company defaces the carton inclosing the medicine and destroys the evidence thereon or thereto attached by which, through a serial number, complainant might trace the seller who breached the contract. In addition, it is charged that defendant sells to retailers who carry on a "cut rate" business, who in turn retail to consumers at rates less than those at which complainant requires all retailers to exact from persons buying for use. The bill in all its important averments as to the manner in which complainant carries on its business and the advantages of such method and the evils of the "cut rate" business in such goods, as well as its averments as

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

†Writ of error granted by Supreme Court.

to the knowledge of the system possessed by the defendant, are substantially identical with the averments of the bill under consideration by this court in Jno. D. Park & Sons Co. v. Hartman, 153 Fed. 24, 82 C. C. A. 158, 12 L. R. A. (N. S.) 1135. In the Hartman system of contracts, the contract between Hartman and the jobber was confessedly one of sale; under the Dr. Miles system, it is claimed, it is one of consignment or agency and not sale. With this distinction, if it exist, the opinion in the Hartman Case may be referred to for a more detailed statement of the evils of the competitive or "cut rate" system and the advantages of the one price or noncompetitive plan which the complainant seeks to bring about by the system of contracts here involved.

The acts and conduct against which complainant seeks relief are identically the conduct complained of in the Hartman Case, and the opinion in that case may be referred to for a more detailed statement of the case here made for relief. A demurrer to the bill was sustained upon the authority of the opinion of this court in the Hartman Case.

Frank F. Reed (Edward S. Rogers and Frederick W. Hinkle, on the brief), for appellant.

William J. Shroder, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge (after stating the facts as above). We see no substantial difference between the systems of contracts under which the Dr. Miles Medical Company is now conducting its business and that under which Dr. Hartman carried on his business as a manufacturer of Peruna, considered by this court at length in the case of Jno. D. Park & Sons v. Hartman, 153 Fed. 24, 82 C. C. A. 158, 12 L. R. A. (N. S.) 1135. That case is pending, undecided, in the Supreme Court. The complainant's very learned counsel was the counsel for Hartman in that case, and both systems of contracts are most probably the fruit of his acknowledged skill in respect to this class of business arrangements. No difference whatever is suggested between the system of contracts considered in that case and those here presented, except, it is claimed, that the agreement with jobbers and wholesale dealers here involved is one of bailment or agency and not one of sale as in the Hartman Case. If this were admitted, it does not, in our judgment, operate to legalize the "system" of which that agreement is but one part. The effect of that contract with jobbers, whether it be regarded as one of sale or of agency, is to restrain jobbers from selling to any save retailers licensed by complainant, and to restrain retailers from selling for resale to any save those licensed to buy or to persons who buy for consumption only, and to none, by either jobber or retailer, except at a price imposed by the manufacturer. The confessed object of this plan or system is to obtain a price to the jobber and to the retailer unaffected by any competition between them. The scheme is one to enhance or maintain prices by eliminating all possibility of competing rates between either jobbers or retailers, and is quite as effectual in its results as if the contract with the jobber was plainly one of sale.

But we are not disposed to concede that the contracts with jobbers are contracts of bailment. There are too many features which seem inconsistent with a mere agency or commission agreement. All the responsibility of an owner seems cast upon the so-called "consignee." He is not given the right to return goods unsold; that can be done only upon the cancellation of the contract and demand for return. The

retention of title for the security of the price would after all make the contract one of conditional sale, and the jobber would still be the general owner and responsible as such. Curiously enough, the actual payment of the price at which the consignment is billed is not to affect the title; it is still, under the contract, to remain with the so-called "consignor." Yet the heavy inducement of 5 per cent. upon a very close class of goods is held out to induce a payment in advance of sales. It is difficult to believe, whatever the technical relation of the parties under such an agreement, and whatever the belief each may have had as to his relation to the other, that such jobbers were not in fact and law the general owners of goods so "consigned," and engaged in selling for themselves and not as the mere agents, del credere or otherwise, of the complainant. The scheme seems to be an effort to disguise the wholesale dealers in the mask of agency upon the theory that in that character one link in the system for the suppression of the "cut rate" business might be regarded as valid. Hardly any two contracts raising the question of sale or agency are so near alike as to make an opinion construing one an authority in another. It matters little what the parties call such agreements. Whether the result is a sale or an agency must depend upon the meaning and intent of the instrument as a whole. Looking at this agreement thus, we think the jobber must be regarded as the general owner and engaged in selling for himself and not as a mere agent of another. True, he must sell, if this system of doing business is valid and enforceable, as he obligates himself to do, but nevertheless he is selling for himself and upon his own account and risk. Coweta Fertilizer Co. v. Brown (decided at this term, and cases therein cited) 163 Fed. 162; Ex parte White, L. R. 1870, 6 Ch. App. Cases; Mack v. Drummond Tobacco Co., 48 Neb. 397, 67 N. W. 174, 58 Am. St. Rep. 691; Peoria Co. v. Lyons, 153 Ill. 427, 38 N. E. 661; Arbuckle v. Kirkpatrick, 98 Tenn. 221, 39 S. W. 3, 36 L. R. A. 285, 60 Am. St. Rep. 854.

This case must, after all, turn upon whether there is such identity of character between the statutory monopoly of articles made under a valid patent or copyright and articles made according to some private formula as to exempt them from the principles which apply to contracts which tend to create a monopoly or restrain trade when the subject is an article not made under a patent or copyright or secret formula. A distinction exists between the extent of the protection granted by the patent and copyright statutes, and the copyright statute has been held "not to create the right to impose, by notice, a limitation at which a book shall be sold at retail by future purchasers, with whom there is no privity of contract." Bobbs Merrill Co. v. Straus (decided by the Supreme Court, June 1, 1908) 210 U. S. 339, 28 Sup. Ct. 722, 52 L. Ed. 1086. This distinction has been drawn since the decision of the cases we refer to, and since the decision of the Hartman Case above referred to. There are decisions by most respectable courts which hold that articles, such as proprietary medicines, are outside of all rules and statutes which forbid contracts in restraint of trade, because they are made under a secret formula. Some, if not most, of these decisions have been made in cases in which the Dr. Miles Medical Company has been a party. They are cited and commented

upon by this court in the case of Jno. D. Park & Sons v. Hartman, 153 Fed. 24, 34, 82 C. C. A. 158, 12 L. R. A. (N. S.) 1135. They go upon the conceded fact that a trade secret or medical formula is a monopoly until discovered by fair means, and will be protected against abuse by one who learns it under a contract limiting its use or in the confidence of an employment. They do not observe any distinction between the necessary monopoly of the secret itself and the unnecessary monopoly of the articles made according to the secret process and offered for sale and resale to the consuming public. Neither do those decisions recognize any distinction between the statutory monopoly accorded to articles protected by a patent or copyright and those made under such private formulas. The argument in support of this result is epitamized in all the cases referred to, but may be seen in full in the opinion of Colt, C. J., in the case styled "Dr. Miles Medical Co. v. Jaynes Drug Co." (C. C.) 149 Fed. 838. The same argument was presented by the counsel now representing the Dr. Miles Medical Company in the case decided by this court of Jno. D. Park & Sons Co. v. Hartman, 153 Fed. 24, 82 C. C. A. 158, 12 L. R. A. (N. S.) 1135, and again presented with elaboration in the present case. In the case referred to, we reached with unanimity the conclusion that no legal, economic, or moral reason existed for regarding contracts in respect to the vast and ever-increasing commerce in proprietary medicines as either outside of the mischief intended to be remedied by the federal statute against monopolies or the rules of the common law, or within the statutory protection afforded by the patent and copyright statutes. Any other conclusion would be to sanction a monopoly in that class of goods vastly more far-reaching than the monopoly extended upon high grounds of public policy to the inventor. The statutory monopoly has a limitation of a few years. To obtain it the inventor must put on record his invention. At the end of the term the public will be free to employ the discovery without the burden theretofore imposed as a compensation to the inventor. Not so with the monopoly asked for by those who control the enormous proprietary trade of this country. Their monopoly, will go on forever, and, if there be merit in their formula, they may not only preserve it through all time, but continue to restrain prices and prevent competition in the sale of the product. It is said that the proprietor of such a secret remedy need never communicate his formula. Concede this. To say that he need never compound his medicine, and that, if he does, he need not sell it unless he chooses, is undoubtedly true. But as much may be said about any article which the producer may choose to make or not to make, sell or not sell, as he wills. So much pertains inherently to the natural freedom of man in respect to his own actions. But if he elects to make and sell a product according to his formula, a public interest is affected if he be permitted to restrain freedom of trade in the article when it has once passed under the dominion of a buyer. A free right of alienation is an incident to the general right of property in articles which pass from hand to hand in the commerce of the world. Coke on Littleton, § 360. The mere fact that one article or class of articles is made under an unknown and private formula and another class is not is an undeniable fact which may serve for some purposes to differentiate them. But

that single fact does not afford an economic reason, and still less a legal reason, for saying that it operates to exempt such articles from rules against unlawful restraints of trade.

We need not repeat the argument by which we reached the conclusion that the system of contracts which Hartman sought to enforce through the injunctive power of a court of equity was obnoxious not only to the statute of Congress against restraints and monopolies in respect of interstate trade but inimical also to the reasonable restraints which at common law may be imposed as ancillary to a principal contract. All that we said in respect to the Hartman system is applicable here. The case falls directly within the reasoning and decision of that case in respect to every aspect of the question, and the decree sustaining the demurrer interposed by the appellees must be affirmed.

"Consignment Contract. Wholesale. The Dr. Miles Medical Company.

"This agreement made by and between the Dr. Miles Medical Company, a corporation, of Elkhart, Indiana, hereinafter referred to as the proprietor and ——————— hereinafter referred to as the consignee, witnesseth:

"That the said proprietor hereby appoints said consignee one of its wholesale distributing agents, and agrees to consign to such consignee for sale for the account of said proprietor such goods of its manufacture as the proprietor may deem necessary, the title thereto and property therein to be and remain in the proprietor absolutely until sold under and in accordance with the provisions hereof, and all unsold goods to be immediately returned to said proprietor on demand and the cancellation of this agreement. Said goods to be invoiced to consignee at the following prices:

"Medicines, of which the retail price is $1.00; $8.00 per dozen.

"Medicines (if any) of which the retail price is 50 cents; $4.00 per dozen.

"Medicines, of which the retail price is 25 cents; $2.00 per dozen.

"Freight on all orders, the invoice price of which amounts to $100.00 or more, to be prepaid by the proprietor; otherwise, freight to be paid by consignee.

"Said consignee agrees to confine the sale of all goods and products of the said proprietor strictly to and to sell only to the designated retail agents of said proprietor as specified in lists of such retail agents furnished by said proprietor and alterable at the will of said proprietor, and to faithfully and promptly account and pay to the proprietor the proceeds of all sales, after deducting as full compensation for all services, charges and disbursements a commission of ten per cent of the invoice value, and a further commission of five per cent on the net amount of each consignment, after deducting the said ten per cent commission, on all advances on account remitted within ten days from date of any consignment, it being agreed between the parties hereto that such advances shall in no manner affect the title to such goods, which title shall remain in the proprietor as if no such advances had been made; provided that such advances shall be repaid to said consignee should the said proprietor terminate this agreement and the return of any unsold goods on which advances have been made. Said consignee guarantees the payment for all goods sold under this agreement and agrees to render a full account and remit the net proceeds on the first day of each month of and for the sales of the month preceding. Failure to make such accounting and remittance within ten days from the first of each month shall render the whole account payable and subject to draft, but the proceeds of such draft shall not affect the title of any unsold goods which shall remain in the proprietor until actually sold, as herein provided.

"It is further agreed that the consignee shall furnish the proprietor from time to time upon demand full statements of the stock of goods of the proprietor on hand on any date specified and that a failure to furnish such statements within ten days from date of such demand shall be a sufficient cause for the cancellation of this agreement, and a demand for the return of the consigned goods.

"It is further agreed that the proprietor will cause each retail package of its goods to be identified by a number and said consignee hereby agrees to furnish the said proprietor full reports upon proper cards or blanks furnished by said proprietor of the disposition of each dozen or fraction of such goods by means of the identifying numbers, specifying the names and addresses of the retail agents to whom such goods have been delivered and the dates of such delivery, and to send such reports to said proprietor at least semi-monthly, and at any other time on the request of said proprietor.

"It is understood and agreed between the parties hereto that the commissions herein specified shall not be considered as earned by said consignee upon any goods of said proprietor which shall have been delivered to dealers not authorized agents of said proprietor, as per list of such agents, or upon any goods whose disposition by said consignee shall not have been properly reported as herein provided, or sold at prices less than the prices authorized, and that said consignee shall not credit any such commissions when making remittances on consignment account provided notice has been given by said proprietor that such commissions are unearned; and that if such unearned commissions have been deducted by said consignee in making advance payments or monthly remittances on account they shall be charged back to said consignee and credited and paid to said proprietor. It is understood that violation or non-observance of any provision hereof by the consignee shall make this agreement terminable and all unsold goods returnable at the option of the proprietor.

"It is agreed that the goods of said proprietor shall be sold by said consignee only to the said retail or wholesale agents of said proprietor, as per list furnished, at not less than the following prices, to-wit:

"Medicines, of which the retail price is $1.00; $8.00 per dozen.

"Medicines (if any), of which the retail price is 50 cents; $4.00 per dozen.

"Medicines, of which the retail price is 25 cents; $2.00 per dozen.

"Provided, that said consignee may allow a cash discount not exceeding one per cent, if paid within ten days from date of invoice, and that when sales at one time and at one invoice, amount to $15.00 or more, the said consignee may allow three per cent trade discount, and if said purchase amounts to $50.00 or more, five per cent trade discount, all without cost to the proprietor, and if such $50.00 quantity shall be shipped direct to the retail purchaser from the laboratory of the said proprietor, on the order from the said wholesale distributing agent, freight will be prepaid by the proprietor, but not otherwise.

"This contract will take effect when the original, duly signed by the consignee, has been received and accepted by the Dr. Miles Medical Company, at Elkhart, Indiana.

"Done under our hands ———————— A. D., 1907.

(Fill in date on above line.)

"The Dr. Miles Medical Company.

"——————————————

"Wholesale dealer. Sign your name on above line. Original return in enclosed envelope."

### "Retail Agency Contract.

### "The Dr. Miles Medical Company.

"This agreement between the Dr. Miles Medical Company of Elkhart, Indiana, and ——————— of ———————, Retailers named on above line, ——————— Town, ——————— State, hereinafter referred to as the retail agent, witnesseth:

### "Appointed Agent.

"The said Dr. Miles Medical Company hereby appoints said retail dealer as one of the retail distributing agents of its proprietary medicines and agrees that said retail agent may purchase the proprietary medicines manufactured by said Dr. Miles Medical Company (each retail package of which the said company will cause to be identified by a number) at the following prices, to-wit:

"Wholesale Prices.

"Medicines, of which the retail price is $1.00; $8.00 per dozen.
"Medicines, of which the retail price is 50 cents; $4.00 per dozen.
"Medicines, of which the retail price is 25 cents; $2.00 per dozen.

"Quantity Discounts.

"Provided that when purchasers at one time and on one invoice amount to $15.00 (or more), wholesale distributing agents are authorized to allow three per cent trade discount; if such purchase amounts to $50.00 (or more) five per cent trade discount will be allowed, and if such $50.00 quantity be shipped direct to the purchaser from the laboratory of said Dr. Miles Medical Company for the account at such wholesale agent, freight will be prepaid, but not otherwise.

"Full Price.

"In consideration whereof said retail agent agrees in no case to sell or furnish the said proprietary medicines to any person, firm or corporation whatsoever, at less than the full retail price as printed on the packages, without reduction for quantity; and said retail agent further agrees not to sell the said proprietary medicines at any price to wholesale or retail dealers not accredited agents of the Dr. Miles Medical Company.

"Violation.

"It is further agreed between the parties hereto that the giving of any article of value, or the making of any concession by means of trading stamps, cash register coupons, or otherwise, for the purpose of reducing the price above agreed upon shall be considered a violation of this agreement, and further it is agreed between the parties hereto that the Dr. Miles Medical Company will sustain damage in the sum of twenty-five dollars ($25.00) for each violation of any provision of this agreement, it being otherwise impossible to fix the measure of damage.

"This contract will take effect when a duplicate thereof, duly signed by the retail agent, has been received and approved by the Dr. Miles Medical Company, at its office at Elkhart, Indiana.

"Done under our hands ———————, A. D., 1907.

(Fill in date on above line.)

"The Dr. Miles Medical Company.

"———————

"Retail dealer, sign your name on above line in ink.

"To retail dealer:

"Paste printed label, giving name and address, that your name may be correctly listed.

"Duplicate. Keep for reference."