W. H. HILL CO. *v.* GRAY & WORCESTER.

1. CONTRACTS—RESTRAINT OF TRADE—INJUNCTION.
   An injunction will not issue upon a bill of complaint of a drug manufacturer to prohibit a corporation engaged in the sale of drugs, from buying a medical preparation, made under a secret process, from dealers or jobbers who are under contract to sell the article at a fixed price to accredited agents of the manufacturer, and from retailing the preparation at a price lower than that fixed by a system of contracts between the manufacturer and the dealers throughout the country, since the contracts and system operate as an unreasonable restraint upon competition.[1] Following *Park & Sons Co.* v. *Hartman*, 153 Fed. 24, 82 C. C. A. 58 (12 L. R. A. [N. S.] 135).

2. SAME—TRADE-MARKS AND TRADE-NAMES.
   The fact that an article of commerce not patented is sold under a trade name or in trade dress affords it no exemption from the common law or statutory rules against restraint of trade.

Appeal from Wayne; Murphy, J. Submitted April 18, 1910. (Docket No. 43.) Decided September 28, 1910.

Bill by the W. H. Hill Company against Gray & Wor-

---

[1] As to legality, under modern anti-trust acts, of agreements restricting the class of persons to whom commodities shall be sold, see note to *Cleland* v. *Anderson* (Neb.), 5 L. R. A. (N. S.) 136.

cester to enjoin the sale of certain drugs in violation of a trade agreement. From a decree dismissing the bill, complainant appeals. Affirmed.

*Keena, Lightner & Oxtoby,* for complainant.

*Chamberlain, May, Denby & Webster,* for defendant.

Stone, J. The complainant corporation for some years past has been engaged in the manufacture and sale of proprietary medicines, including specially Hill's Cascara Bromide Quinine, a cold cure in tablet form. It is claimed that this preparation has acquired a reputation with the public as being an efficient remedy, and that the good will of complainant therein is a property right of great value. The tablets are, and since the year 1900 continuously have been, put up by complainant in a distinctive package and dress. These tablets are made under and in pursuance of a secret formula which is the sole property of complainant, and it has the exclusive right to the formula under which the tablets are made, and also to the name of the preparation, and to the peculiar or distinctive dress in which it has been marketed by complainant. It is also claimed that the demand for this article has been created with the consuming public by its merits, and by extensive advertising on the part of complainant. There are upon the market, available to the public, quantities of other preparations in tablet form, for similar purposes, and many druggists throughout the country put up and sell similar preparations on their own account. The price of complainant's said preparation to the consumer is 25 cents for a small box, and complainant has at all times sold its preparation at fixed prices. The policy of the complainant has been to refuse to sell its preparation to any dealer upon more favorable terms than to others, to discourage the giving of secret rebates upon its goods by the jobber to the retail druggist, and to require the sale of its preparation at the equal price aforesaid to the consuming public.

The bill states: That since the spring of 1905 said

preparation has been sold only upon what is known as the direct contract plan; each carton or dozen boxes of said preparation is marked with a distinctive serial number, and each box contained in each carton is similarly identified, and in each carton there is placed a record card which, under said direct contract plan, is returned to complainant by the wholesale druggist, upon a sale of said preparation, showing to whom said preparation has been sold; that, as a part of said direct contract plan, complainant enters into a direct retail agency contract with any and all retail druggists who are desirous of selling its preparations; that no discrimination is made by complainant, and that all druggists are given full opportunity of signing said contract, and of obtaining complainant's preparation at fixed and uniform prices; that, under a contract with the wholesale druggist, said preparation can be sold and delivered only to druggists who have entered into a contract with complainant. Said retail agency contract contains the following provisions:

"In consideration whereof, said retail dealer hereby agrees not to sell or furnish at any price the said proprietary medicines to wholesale or retail dealers not accredited agents of the said company; nor to any other person, firm or corporation at less than the retail price fixed by the said W. H. Hill Company and printed upon each package."

The retail price of Hill's Cascara Bromide Quinine is fixed by said contract at 25 cents a box. The said wholesale agency contract contains the following clause:

"In consideration whereof, said wholesale dealer hereby covenants and agrees not to furnish or sell any of the proprietary remedies manufactured by the said W. H. Hill Company to any persons, firms or corporations, to whom said W. H. Hill Company may, at any time, notify said wholesale dealer not to sell any of its medicines."

The bill further states: That contracts had been signed by complainant with more than 1,500 retail druggists in the State of Michigan, and that the purpose of said method of selling complainant's preparation was to prevent secret

rebates in prices and discrimination on the part of wholesale druggists and others in favor of or against particular retail druggists, and to prevent cutting of prices and demoralization of trade, and the injury which would result therefrom to the reputation and good will of complainant's business, and especially to its said preparation; that the said plan of sale of said preparation has been generally adopted, and, with few exceptions, said wholesale druggists and retail druggists have observed the terms of said contract, and especially that said preparation has been sold at the uniform price of 25 cents a box; that on or about March 1, 1906, the defendant executed with complainant one of said retail agency contracts, and in pursuance thereof defendant secured, in the usual course of business, through the wholesale dealer, such quantities of said preparation as it desired, and, as far as complainant was advised, defendant observed the terms of said contract until November, 1907, or thereabouts; that in the month of December, 1907, said defendant notified complainant that it desired to cancel said contract of March 1, 1906, and it was thereupon surrendered by defendant; that on or about January 10, 1908, defendant began advertising in the Detroit papers that it was selling Hill's Cascara Bromide Quinine at 20 cents a box; that defendant did sell complainant's preparation at this price, and in all such sales, before the filing of the bill of complaint, as far as appears, the serial number printed on the side of the small boxes was obliterated.

It is claimed that the defendant, after canceling its contract with complainant, knowing that it could not secure complainant's goods from wholesale dealers who were advised of the cancellation of the contract, did not buy its goods in Detroit, but obtained them in Boston and in New York from wholesale jobbers, who undoubtedly sold to it under the impression that it was still under contract with complainant; that the defendant, well knowing the situation and desiring to cover up its fraud in thus securing the goods, obliterated the

numbers as above stated. The complainant asked the court to enjoin defendant from selling its said preparation at a price less than 25 cents a box; also from securing for sale complainant's preparation, by inducing a breach of contract on the part of the wholesale dealers, or others under contract relations with complainant; and also from mutilating the boxes containing said preparation.

In its answer the defendant denied that the purpose of the method of selling complainant's preparation was as set forth in the bill, but avers that the purpose was to keep the selling price of the article—then an article of common use in the State—at a fixed and graduated figure in order to create a monopoly, and secure the profits of that monopoly; that the purpose and effect of said method of selling complainant's preparation and the contracts incident to said method formed, among the wholesale and retail dealers entering into said contract, a combination, or trust to carry out a restriction in trade or commerce, and control the price of said commodity, and prevent free competition among and between said wholesale and retail dealers so combining, and free competition between such wholesale and retail dealers and other independent dealers, who may be desirous of competing; and that complainant's method of selling its preparation had in fact resulted in practically a complete monopoly of the trade and commerce in said preparation, and that each of said contracts set forth in complainant's bill was, and the combination of said contracts forming complainant's so-called method was also, illegal and fraudulent as a restraint of trade and commerce both at common law, and under the laws of the State of Michigan, and especially in violation of the provisions of Act No. 255, Pub. Acts 1899, and are absolutely void, and not enforceable either in law or equity. The defendant denied all fraudulent conduct, combination, and collusion as alleged by complainant, and averred that, after the cancellation of said contract, it purchased said preparation in the regular and ordinary course of business in the open market. The complainant offered

evidence tending to support its bill. Defendant offered no evidence.

The secretary of the complainant testified, among other things, that it had altogether about 25,000 contracts with retail dealers throughout the United States. That was only an estimate. On cross-examination he testified as follows:

"The primary purpose of the contract plan evidenced by the exhibits is to fix the price of Hill's Cascara Bromide Quinine at 25 cents to the consumer, and to fix the price to the wholesaler at the figure fixed in the wholesale contract. If the contract is lived up to, there will be no competition in the sale of Hill's Cascara Bromide Quinine, as far as the price is concerned.

"Q. What other competition could there be?

"A. Well, the competition of two jobbers in one town getting the business.

"Q. How could they get the business? It is the same commodity that they are trying to sell?

"A. Yes, sir.

"Q. They are not allowed to cut the price?

"A. Not at all.

"Q. Then, how would they get the business except by cutting the price?

"A. By personal solicitation.

"Q. For the same article?

"A. For the same article.

"Q. At the same price?

"A. Yes, sir.

"Q. And that is the only competition that you can think of?

"A. Yes, sir.

"Q. As I understand it, the real purpose of this contract system is to keep up the price of Hill's Cascara Bromide Quinine to 25 cents to the consumer?

"A. That is the main object.

"Q. Under any and all circumstances?

"A. Yes. We have about 1,800 of these contracts in the State of Michigan, at the present time, and at the time the bill of complaint was filed we had something over 1,800. This includes not only the druggists, but also, in the smaller communities, general stores, which handle a great many proprietary articles. There are about 1,700

druggists in the State of Michigan, and I would say of that number 1,500 are bound by the terms of our contract. That insures the company as far as the price goes a practical monopoly on the article.

"*Q.* And the W. H. Hill Company does as a result of these contracts have a monopoly in the State of Michigan?

"*A.* If you care to term it so, yes.

"*Q.* Well, what do you term it? Can you tell us any other term to use in connection with it, rather than monopoly?

"*A.* Why naturally, the Hill Company would have a monopoly of their own goods.

"*Q.* Well, then, that term applies to the situation?

"*A.* Oh, yes. The contract which Gray & Worcester had with our company was canceled by mutual consent on the 4th of December, and from that time until the present Gray & Worcester had no contract relations with the company."

Upon the hearing the learned circuit judge held that complainant's contracts were void as being in restraint of trade, and a final decree was entered dismissing the bill of complaint. The complainant has appealed.

In a lengthy brief, and in an able oral argument, complainant's counsel claim that its said contracts are valid and enforceable, and that they are not in restraint of trade at common law, and are not in violation of any statute. Our attention has been called to two recent cases decided by the United States circuit court of appeals for the sixth circuit. The opinions were written by Mr. Justice Lurton, and were concurred in by the other members of the court. *John D. Park & Sons Co.* v. *Hartman*, 153 Fed. 24, 82 C. C. A. 158 (12 L. R. A. [N. S.] 135); *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 164 Fed. 803, 90 C. C. A. 579. In the first case Hartman was the manufacturer of the well-known proprietary medicine called "Peruna." This he put upon the market through a system of contracts intended to maintain prices. The system there adopted was so nearly like the one we are here considering that it need not be here described. In fact, complainant's counsel admit that, if said opinions of Mr. Justice

Lurton are right, they expect this court to follow them as decisive of the case. An examination of the cases above referred to, and of the cases there cited and reviewed, has been made. The opinion in the *Hartman Case* deals with every phase of this case. It cites many authorities and covers more than 20 pages, and its length prevents a full quotation. There the bill of complaint was demurred to. The doctrine of the case may be briefly stated as follows: The exemption from the common-law rule against monopoly and restraint of trade, and the provisions of the Federal anti-trust act of July 2, 1890, chap. 647, 26 Stat. 209 (U. S. Comp. Stat. 1901, p. 3200), which has been extended to contracts affecting the sale and resale, the use, or the price of articles made under a patent, or productions covered by a copyright, does not extend also to articles made under a secret process, or medicine compounded under a private formula. While the owner of the patent or copyright is protected in his exclusive right by the statute which gives him a monopoly, there is no statute which protects one who makes or vends an article which is made by a secret process or private formula, nor, so long as he keeps his process secret, can he bring himself within the principle of the statute which grants a temporary monopoly in consideration of the full publication of the invention or work. The owner of a secret process or formula is not protected by law in his secret, but he may protect himself by contract against its disclosure by one to whom it is communicated in confidence, or restrict its use by such person, and such contracts are not in restraint of trade because of the character of the property right in the secret which would be destroyed by its disclosure, and because it is not in itself an article of commerce, *but such considerations do not apply to contracts for the sale of the manufactured product which do not involve a disclosure of the secret, and such contracts are within the rules against restraint of trade.* The trading stamp and railroad ticket cases, such as *Sperry & Hutchinson Co.* v. *Mechanics' Clothing Co.*, 135 Fed. 833,

and *Nashville, etc., R. Co.* v. *McConnell*, 82 Fed. 65, rest upon the peculiar character of the property rights involved. Neither concerns the buying and selling of articles of general commerce, and both relate to things in the nature of contracts personal in character, and not to things which can ever become the subject of general trade and traffic.

It does not follow, because a secret process or formula for a medicine will be protected against betrayal by employés, or those to whom it has been communicated in confidence, that a system of contracts for the control of all sales and subsales of the medicine when once made will be outside of the rules in restraint of trade simply because it is the product of such secret formula or process. The preparation when ready for the market and the formula are two separate and distinct things. Freedom of traffic in that is consistent with its value, and does not involve expense of the formula. None of the reasons which apply to patented articles, copyrighted productions, or to restricted disclosure of the secret formula itself, apply to the product of the formula. The cases directly in point opposed to this view are *nisi prius* decisions except one in the circuit court of appeals for the third circuit. The fact that an article of commerce is sold under a trade-name or in trade dress affords it no exemption from the common-law or statutory rules against restraint of trade.

Where the sole manufacturer of a medicine, made in accordance with a secret formula, but unpatented, sold the same only under a system of contracts between himself and wholesale dealers, to whom alone he sold at uniform prices by which they bound themselves to sell at a certain price, and only to retail dealers designated by him, and between him and such retail dealers, by which, in consideration of being so designated, they bound themselves to sell to consumers only and at a certain price, and such contracts had been entered into, as the manufacturer alleged, by a large majority of the wholesale and retail druggists in the United States, it was held that such

system of contracts was *prima facie* illegal both at common law as in unreasonable restraint of trade, and under the Federal anti-trust act as aforesaid, where it affected interstate sales, its purpose and effect being to prevent competition between purchasers of the medicine, both wholesale and retail, and that, in the absence of allegation of facts showing it to be necessary for the protection of the manufacturer's business, a court of equity would not aid in the enforcement of the contracts by granting an injunction to prevent a defendant, who was not a party thereto, from buying the medicine from purchasers who were, and reselling the same at any price it might see fit. A single contract, although it be such as, taken alone, may not be within the rule at common law against contracts in restraint of trade, which is one of a great number of identical contracts made between the producer of an unpatented article of commerce and dealers therein, forming a "system" of contracts, which, taken as a whole, materially affects the public interests by stifling competition and trade in said article, is an unreasonable restraint, and within the rule at common law against contracts in restraint of trade, if, from an examination of the workings of the whole system, it appears that the restraint is actually, though not ostensibly, the main result and object of the system of contracts, and not merely ancillary or incidental to another and legitimate object.

In view of the evidence in this case showing the number and scope of the contracts, and the establishment of a "system," the following excerpt from the opinion in the *Hartman Case* is pertinent:

"Assuming that these contracts operate only as a partial, and not a general, restraint, a question which we do not concede, and that they are properly to be considered as covenants ancillary to a principal contract, are the restraints thereby imposed necessary to protect the complainant in his retained business, or to protect him from an unjust use of the articles by the purchaser? In the first place, we are to consider that we are not here dealing with a single contract. The complainant has made a

multitude of them in identical terms, and the opposite parties comprehend, according to his bill, a large majority of the wholesale and retail druggists in the United States. The reasons which might uphold covenants restricting the liberty of a single buyer might prove quite inadequate when there are a multitude of identical agreements. The single covenant might in no way affect the public interest, when a large number might. So, also, the question as to whether the restraint was necessary to the retained business, and therefore ancillary to the principal purpose of the agreement, or whether the restraining covenants were not the principal, rather than the ancillary, matter, would largely depend upon the general sweep and result of a multiplication of identical contracts. The general purpose of each separate contract is the regulation of the prices and sales of the line of preparations made by complainant. A common purpose unites each covenantee to every other, and the 'system' is to be construed as 'one piece,' in which the complainant and every assenting dealer, whether wholesaler or retailer, is a party, and the agreement of each such covenantee to sell only at the prices dictated by the manufacturer constitutes one general scheme. The question here is therefore one of a totally different character from that which would arise if the question was the more simple one presented by a breach by a single covenantee. In *Continental Wall Paper Co.* v. *Voight & Sons Co.*, 148 Fed. 939 [78 C. C. A. 567, 19 L. R. A. (N. S.) 143], where was involved a combination in restraint of trade, and where each wholesaler and retailer in the business had executed separate but identical contracts with the corporation representing the combined manufacturers, we held that each such separate covenantee was a party to the general scheme for enhancing prices. This was rested upon the holding that the several agreements constituted one whole. See, also, observations of Judge Taft in *United States* v. *Addyston Pipe & Steel Co.*, 85 Fed. 275, 29 C. C. A. 141 (46 L. R. A. 122), and of Justice Peckham in *Montague & Co.* v. *Lowry*, 193 U. S. 38, 45, 46 (24 Sup. Ct. 307).

"The plain effect of the 'system of contracts,' the purposed relation of each to every other being confessed by the very description of the method of carrying on business stated in the bill, is, first, to destroy all competition between jobbers or wholesale dealers in selling complainant's preparations. Complainant restrains himself by agreeing to sell at only one price and to only such persons

as will sign one of his system of contracts.   The contracting wholesalers or jobbers covenant that they will sell to no one who does not come with complainant's license to buy, and that they will not sell below a minimum price dictated by complainant.   Next, all competition between retailers is destroyed, for each such retailer can obtain his supply only by signing one of the uniform contracts prepared for retailers, whereby he covenants not to sell to any one who proposes to sell again unless the buyer is authorized in writing by the complainant, and not to sell at less than a standard price named in the agreement.   Thus all room for competition between retailers who supply the public is made impossible.   If these contracts leave any room at any point of the line for the usual play of competition between the dealers in the product marketed by complainant, it is not discoverable.   Thus a combination between the manufacturer, the wholesalers, and the retailers to maintain prices and stifle competition has been brought about."

Referring to the claim that defendant knew complainant's plan, and that in selling to defendant each dealer thereby breached his contract, the following extract from said opinion is appropriate here:

"That Park & Sons Company knew complainant's plan of business, and that in selling to them every such vendor thereby breached his agreement, is also charged, and for the purpose of the demurrer, admitted.   What is the result?   Did the defendants by so purchasing, with knowledge of the restrictions imposed upon sales, thereby enter into contractual relations with complainant?   Manifestly not.   Did they obtain the absolute title, notwithstanding their knowledge that the sale was in breach of restrictions imposed upon the seller?   Undoubtedly.   The restrictions imposed by complainant upon sales and resales, if valid at all, are only so because they constitute personal contracts upon which an action will lie only against the contracting party.   *Garst* v. *Hall & Lyon Co.*, 179 Mass. 588 (61 N. E. 219, 55 L. R. A. 631).   A prime objection to the enforceability to such a system of restraint upon sales and prices is that they offend against the ordinary and usual freedom of traffic in chattels or articles which pass by mere delivery.   The right of alienation is one of the essential incidents of a right of general property in moveables, and restraints upon alienation have been generally regarded

as obnoxious to public policy, which is best subserved by great freedom of traffic in such things as pass from hand to hand. General restraint in the alienation of articles, things, chattels, except when a very special kind of property is involved, such as a slave, or an heirloom, have been generally held void. 'If a man,' says Lord Coke, in Coke on Littleton, § 360, 'be possessed of a horse or any other chattel real or personal, and give his whole interest or property therein, upon condition that the donee or vendee shall not alien the same, the same is void, because his whole interest and property is out of him so as he hath no possibility of reverter; and it is against trade and traffic and bargaining and contracting between man and man.' It is also a general rule of the common law that a contract restricting the use or controlling subsales cannot be annexed to a chattel, so as to follow the article and obligate the subpurchaser by operation of notice."

The opinion in the *Hartman Case* was written in March, 1907. A writ of certiorari was issued by the Supreme Court of the United States to review the decision. But the writ was dismissed on December 21, 1908, upon motion of petitioner. After the decision of the *Hartman Case*, the drug company sought to evade that decision by means of a consignment contract so-called, and that case was before the same court in September, 1908. *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, *supra*. In this last case, after disposing of the consignment contract, Justice Lurton said:

"This case must, after all, turn upon whether there is such identity of character between the statutory monopoly of articles made under valid patent or copyright and articles made according to some private formula, as to exempt them from the principles which apply to contracts which tend to create a monopoly, or restrain trade when the subject is an article not made under a patent or copyright or secret formula. * * * There are decisions by most respectable courts which hold that articles, such as proprietary medicines, are outside of all rules and statutes which forbid contracts in restraint of trade, because they are made under a secret formula. Some, if not most, of these decisions have been made in cases in which the Dr. Miles Medical Company has been a party. They are cited and commented upon by this court in the case of

*John D. Park & Sons* v. *Hartman, supra.* They go upon the conceded fact that a trade secret or formula is a monopoly until discovered by fair means, and will be protected against abuse by one who learns it under a contract limiting its use, or in the confidence of an employment. They do not observe any distinction between the necessary monopoly of the secret itself and the unnecessary monopoly of the articles made according to the secret process, and offered for sale and resale to the consuming public. Neither do those decisions recognize any distinction between the statutory monopoly accorded to articles protected by a patent or copyright and those made under such private formula. * * * In the case referred to, we reached with unanimity the conclusion that no legal, economic, or moral reason existed for regarding contracts in respect to the vast and ever-increasing commerce in proprietary medicines as either outside of the mischief intended to be remedied by the Federal statute against monopolies, or the rules of the common law, or within the statutory protection afforded by the patent and copyright statutes. Any other conclusion would be to sanction a monopoly in that class of goods vastly more far-reaching than the monopoly extended upon high grounds of public policy to the inventor. The statutory monopoly has a limitation of a few years. To obtain it, the inventor must put on record his invention. At the end of the term, the public will be free to employ the discovery without the burden theretofore imposed as a compensation to the inventor. Not so with the monopoly asked for by those who control the enormous proprietary trade of this country. Their monopoly will go on forever, and, if there be merit in their formula, they may not only preserve it through all time, but continue to restrain prices and prevent competition in the sale of the product.

"It is said that the proprietor of such a secret remedy need never communicate his formula. Concede this. To say that he need never compound his medicine, and that, if he does, he need not sell it unless he chooses, is undoubtedly true. But as much may be said about any article which the producer may choose to make or not to make, sell, or not sell, as he wills. So much pertains inherently to the natural freedom of man in respect to his own actions. But, if he elects to make and sell a product according to his formula, a public interest is affected if he be permitted to restrain freedom of trade in the article, when it has once passed under the dominion of a buyer.

\* \* \* The mere fact that one article or class of articles is made under an unknown and private formula, and another class is not, is an undeniable fact which may serve for some purposes to differentiate them. But that single fact does not afford an economic reason, and still less a legal reason, for saying that it operates to exempt such articles from rules against unlawful restraints of trade.

"We need not repeat the argument by which we reached the conclusion that the system of contracts which Hartman sought to enforce through the injunctive power of a court of equity was obnoxious, not only to the statute of congress against restraints and monopolies in respect of interstate trade, but inimical also to the reasonable restraints which at common law may be imposed as ancillary to a principal contract."

In our opinion the arguments and reasoning of the able court that decided these cases meet and answer every position advanced by complainant's counsel in this case. We are content with the reasoning, the citation, and review of authorities, and the conclusion reached by that court, and we think that they are decisive, and controlling of every question here involved. We note in passing that there is no evidence in this record showing that the defendant purchased any goods from any person or firm that had been notified not to sell to it. Crittenden & Co., the Eastern Drug Company, and all other dealers in contract relation with complainant had a right to sell to defendant whose name was listed, unless notified not to do so, in any view of the case. But we place our decision upon the ground that complainant's system of contracts deals with the manufactured product of its secret process, and not with the process itself, and that the system of contracts, being a restraint upon free competition, falls within the common-law prohibition of restraints of trade, and is void.

Having reached this conclusion, it is unnecessary to decide whether or not such contracts are illegal and void under the statute of this State.

The decree below will be affirmed, with costs.

OSTRANDER, HOOKER, MOORE, and BLAIR, JJ., concurred.