# Court of Appeals.

March 12, 1895.

## PEOPLE v. THE MILK EXCHANGE, LIMITED.

(64 St. Rep. 694; 145 N. Y. 267.)

COMBINATION—ILLEGAL.

> A combination on the part of the milk dealers and creamery men in and about the city of New York to fix and control the price that they should pay for milk, is unlawful, and an action to annul the corporate existence of such combination is maintainable.

Appeal from order of the general term of the supreme court in the fourth judicial department, which reversed a judgment in favor of defendant entered upon an order dismissing the complaint on trial at circuit and granted a new trial.

'Alfred Ely, for appellant.

T. E. Hancock, Attorney-General, for respondent.

HAIGHT, J.—This action was brought to have the defendant, a domestic corporation, dissolved, its charter vacated and its corporate existence annulled. This relief is sought on two grounds: First, non-user; second, an unlawful and illegal combination and conspiracy made in restraint of trade to limit the supply of milk, and to fix and control the price thereof in the city of New York and elsewhere.

The defendant was organized on the 21st day of October, 1882, for the purpose, as stated in its certificate of incorporation, of "buying and selling of milk at wholesale and retail; the purchase of dairies of milk when deemed advisable, and the sale of the same to milk dealers." The complaint charges that the defendant was not engaged in this business. Upon the trial at the close of the evidence, it was conceded by both counsel for the plaintiff and for the defendant that the question whether the defendant had been engaged in buying or selling milk, under the evidence, was a question of law for the court and not for the jury. We so understand the evidence. There is no conflict, and we have but to ascertain the meaning and intention of the witnesses. The plaintiff's chief witness was Woodhull, the secretary and treasurer of the defendant. In his testimony he makes use of the expression that the exchange "has bought and sold milk;" but he then proceeds to state that he is familiar with the operations of the Milk Exchange in buying milk of the farmers and seling it to dealers, and then states the manner in which the business was conducted. He says: "It is this—a farmer brings his dairy into the exchange to be sold; I go out and find him a dealer who can use the milk, and write the farmer how to mark his milk; I make the collection of the dealer and pay it to the farmer, and we guarantee him the collection." He further testified that their commission was three per cent.; that the milk was never shipped to the exchange, but was shipped directly to the dealer; that they sold the milk for the farmer at the exchange price, which they guaranteed to collect and turn over to the farmer, less the commissions. Nu-

merous witnesses speak of their arrangement made, or attempted to be made, with the exchange for the sale of milk, and in each case it was distinctly stated that the exchange did not buy milk; that they merely looked up a dealer who would purchase it at the exchange price, and that they guaranteed the collection for three per cent. commission.

We think, therefore, that there can be no question as to the meaning of the witness Woodhull as to the expression made use of by him above referred to, for he immediately proceeded to explain how the milk was purchased and sold, and this evidence establishes the fact that the milk was not purchased by the exchange, but that it was sold in the manner described for the commission stated. The transactions, therefore, constituted a commission business, and were not, strictly speaking, the "buying and selling of milk at wholesale and retail." Whether the engaging in a commission business, such as we have described, is authorized by the defendant's charter, we do not deem it necessary now to determine. It may be that the commission business is so closely allied to that of buying and selling as to make the former legitimate and permissible under the defendant's certificate of incorporation.

We are thus brought to a consideration of the charge of unlawful conspiracy in restraint of trade. We have only called attention to the charge of non-user for the purpose of showing the precise nature of the business conducted by the defendant, as bearing upon the latter question. If the defendant was the purchaser of milk, or of dairies of milk, it had the right to fix the price from time to time that it would pay therefor. If, however, it was engaged only in the selling of milk upon commission, then its duty as a commission merchant, as ordinarily understood, was to get as high a price for the seller as could be reasonably obtained, and it was no part of its duty to otherwise fix the price of milk.

It appears that the Milk Exchange, when organized, or shortly thereafter, had ninety odd stockholders, a large majority of whom were milk dealers in the city of New York or creamery or milk commission men doing business in that vicinity; that at the first meeting of the exchange after its incorporation, the following, among other by-laws, was adopted: "The board of

directors shall have the power to make and fix the standand or
market price at which milk shall be purchased by the stock-
holders of this company and to declare the stock of any and
every stockholder herein who purchases milk at any other than
the price so named by the board, forfeited, subject to the con-
ditions set forth in article 3, sections 4 and 5, of these by-laws.
All stock so forfeited by said board of directors shall be supject
to the order of the board of directors and shall be disposed of as
they direct." This by-law remained in force for a number of
years and until after there was an investigation as to the char-
acter and nature of the defendant's business and a report made
by a committee of the senate. The by-law was then amended
by striking out that part thereof which authorized the forfeiture
of the stock of a stockholder who purchased milk at another
price than that fixed by the exchange. It was again amended in
April, 1890, but that part thereof which provided that the board
of directors shall have the power to determine and fix from time
to time the exchange price of milk was retained. Acting upon
these by-laws the defendant's board of directors have from time
to time during its corporate existence fixed the price of milk to
be paid by dealers, and the prices so fixed have largely con-
trolled the market in and about the city of New York and of
the milk-producing territory contiguous thereto.

These facts are significant, and we are unable to escape the
conviction that there was a combination on the part of the milk
dealers and creamery men in and about the city of New York
to fix and control the price that they should pay for milk. Was
this lawful?

In Judd v. Harrington, 139 N. Y. 105; 54 St. Rep. 471, certain
parties, who were dealers in sheep and lambs, entered into an
agreement, by its terms organizing an association for the de-
clared purpose of guarding and protecting their business in-
terests from loss by unreasonable competition. The agreement
was to pool their commissions, except such as should be agreed
to be paid to a butchers' association with which they had
agreed only to sell to the butchers and the butchers to buy only
of the dealers belonging to their respective associations. It
was held that the real nature and purpose of the agreement
was to suppress competition in an article of food, and to so

control the market that they could enhance the price of the article.

In People v. Sheldon et al., 139 N. Y. 251; 54 St. Rep. 513, certain coal dealers organized a company known as the "Lockport Coal Exchange." The object of the organization was to prevent competition in the price of coal among the retail dealers in that city by constituting the exchange the sole authority to fix the price which should be charged by the members for coal sold by them. Sheldon and others, members of the exchange, were indicted, charged with the offense of doing an act injurious to trade or commerce. The trial judge submitted the case to the jury upon the theory that if the defendants entered into the organization for the purpose of controlling the price of coal and managing the business of the sale thereof, so as to prevent competition in the price between the members of the exchange, the agreement was illegal. The jury found the defendants guilty. It was held that the principle upon which the case was submitted to the jury was sanctioned by the authorities. Andrews, Ch. J., in delivering the opinion of the court said: "The question is, was the agreement, in view of what might have been done under it, and the fact that it was an agreement the effect of which was to prevent competition among the coal dealers, one upon which the law fixes the brand of condemnation? It was hitherto been an accepted maxim in political economy that 'competition is the life of trade.' The courts have acted upon and adopted this maxim in passing upon the validity of agreements, the design of which was to prevent competition in trade, and have held such agreements to be invalid." Again he says: "Agreements to prevent competition in trade are, in contemplation of law, injurious to trade, because they are liable to be injuriously used. The present case may be used as an illustration. The price of coal now fixed by the exchange may be reasonable in view of the interests, both of dealers and consumers, but the organization may not always be guided by the principle of absolute justice. * * * If agreements and combinations to prevent competition in prices are or may be hurtful to trade, the only sure remedy is to prohibit all agreements of that character. If the validity of such an agreement was made to depend upon actual proof of public prejudice or injury, it would be

very difficult in any case to establish the invalidity, although the moral evidence might be very convincing."

In Arnot v. Pittston & Elmira Coal Co., 68 N. Y. 558, the Butler Colliery Company and the Pittson & Elmira Coal Company were corporations engaged in mining and selling coal. For the purpose of monopolizing the trade and maintaining a high price for coal, the two companies entered into a contract by which one agreed to take all of the coal which the other should desire to send north of the state line at the regular market price, and agreed not to sell coal to any other party to be shipped in the direction. It was held that the agreement was entered into for the purpose of enhancing the price of coal north of the state line, and that it was against public policy and void. Rapallo, J., in the opinion, says: "That a combination to effect such a purpose is inimical to the interests of the public, and that all contracts designed to effect such an end are contrary to public policy, and, therefore, illegal, is too well settled by adjudicated cases to be questioned at this day." See People v. Fisher, 14 Wend. 9; Hooker and Woodward v. Vanderwater, 14 Denio, 349; Stanton v. Allen, 5 id. 434; Saratoga County Bank v. King, 44 N. Y. 87; Leonard v. Poole, 114 id. 371; 23 St. Rep. 753.

Applying the rule thus established to the evidence under consideration, it appears to us that a case is presented in which the jury might have found that the combination alluded to was inimical to trade and commerce, and, therefore, unlawful.

It may be claimed that the purpose of the combination was to reduce the price of milk, and that it being an article of food such reduction was not against public policy. But the price was fixed for the benefit of the dealers, and not the consumers, and the logical effest upon the trade of so fixing the price by the combination was to paralyze the production and limit the supply, and thus leave the dealers in a position to control the market, and at their option to enhance the price to be paid by the consumers. This brings the case within the condemnation of the authorities to which we have referred.

It is asserted that this litigation was instituted upon the petition of members of the "Milk Producers' Union," and that the purpose of that association was to enhance the price of milk.

This may be, but the action was brought by the attorney-general, and the influences that operated upon him to induce his prosecution of the defendant are now unimportant. The questions for our determination are presented by the pleadings, and the parties have the right to have them determined upon the merits. If the "Milk Producers' Union" is engaged in an unlawful business, which is a restraint upon trade and commerce, it may be dealt with in another action.

The order appealed from should be affirmed and judgment absolute ordered in favor of the plaintiff upon the stipulation, with costs.

All concur (ANDREWS, Ch. J., and BARTLETT, J., on the ground of non-user), except PECKHAM, J., who dissents upon the ground that there was proof sufficient of user, and that the action of the defendant did not fairly tend to enhance the price of milk to the consumer.

Order affirmed and judgment accordingly.

## NOTE ON COMBINATIONS.

A combination to control prices is illegal. People v. Sheldon, 50 St. Rep. 231.

An association of manufacturers of wire cloth formed for the avowed purpose of regulating the price of the commodity, each of the members stipulating, under a heavy penalty, that he will not sell at less than a specified rate, was held in DeWitt Wire Cloth Co. v. New Jersey Wire Cloth Co., 14 N. Y. Supp. 277, to be contrary to public policy and illegal.

An agreement, association, combination or arrangement, or whatever else it may be called, having for its objects the removal of competition and the advancement of prices of the necessaries of life, violates subdivision 6 of this section. People v. North R. S. R. Co., 54 Hun, 380; 27 St. Rep. 284; 7 N. Y. Supp. 411.

A consolidation of manufacturing corporations, save in the manner and as provided by statute, and whether made directly or indirectly through the medium of a trust, is unlawful and injurious to the public interests. People v. North R. S. R. Co., 121 N. Y. 582; 31 St. Rep. 781.

If two or more persons conspire to commit any act injurious to trade or commerce, each of them is guilty of a misdemeanor. Leonard v. Poole, 114 N. Y. 377; 23 St. Rep. 753.

See People v. Snaith, 57 Hun, 334; 32 St. Rep. 569; 10 N. Y. Supp. 590; People v. Sheldon, 21 N. Y. Supp. 859; 50 St. Rep. 231; People v. Crotty, 30 St. Rep. 46; 9 N. Y. Supp. 938; People v. Lenhardt, 4 N. Y. Cr. 326.