STEWART *et al.* v. W. T. RAWLEIGH MEDICAL CO.

No. 6248.   Opinion Filed June 6, 1916.

Rehearing Denied October 3, 1916.

(159 Pac. 1187.)

1. **CONSTITUTIONAL LAW—Power to Regulate Commerce—Liberty of Contract.** The constitutional guaranty of liberty of the individual to enter into private contracts does not limit the power of Congress so as to prevent it from legislating upon the subject of contracts in restraint of interstate or foreign commerce.

2. **MONOPOLIES—Validity of Contracts—"Restraint of Trade."** A contract of absolute sale, made by a manufacturer of its various manufactured preparations, in which the purchaser agrees to sell the goods purchased "at regular retail prices to be indicated by it (the manufacturer)," where its entire product is sold throughout the country only by means of like restrictive contracts, operates as a "restraint of trade," unlawful as to interstate commerce under the Anti-Trust Act of July 2, 1890 (26 Stat. 209, c. 647; U. S. Comp. St. 1901, p. 3200).

3. **SAME.** Where commodities have passed into the channels of trade and are owned by dealers, the validity of agreements to fix and control the price paid therefor by the consumer is not determined by the circumstance whether they were produced by several manufacturers or by one, or whether they were previously owned by one or by many. The manufacturer having sold its product at prices satisfactory to itself, the public is entitled to

whatever advantage may be derived from competition in the subsequent traffic.

4. **SAME.** The defense that a contract is in violation of the act of Congress of July 2, 1890 (26 Stat. 209, c. 647), to protect trade and commerce against unlawful restraints and monopolies, which makes illegal every contract violative of its provisions, may be set up by a private individual when sued thereon, and, if proved, constitutes a good defense to the action.

(Syllabus by the Court.)

*Error from District Court, Grady County;*
*Frank M. Bailey, Judge.*

Action by W. T. Rawleigh Medical Company against Warren F. Stewart and others. Judgment for plaintiff, and defendants bring error. Reversed.

*Blanton & Andrews, Albert Rennie, Marion Henderson.* and *Bond, Melton & Melton,* for plaintiffs in error.

*Swan C. Burnett, C. E. Cruikshank,* and *I. P. Gassman,* for defendant in error.

SHARP, J. For convenience the W. T. Rawleigh Medical Company will hereinafter be referred to as the plaintiff, and the plaintiffs in error as defendants. Plaintiff's action was to recover of Henry Minette as principal, and of the other defendants as guarantors, a balance of $1,212.22, on account of certain bills of merchandise sold Minette pursuant to a written contract between said Minette and the plaintiff, the performance of which, it was charged, was guaranteed by the defendants Stewart, Alexander, Henson, and Sparks. The contract is in part as follows:

"Whereas, Henry Minette, of Pauls Valley, Oklahoma, desires to purchase of the W. T. Rawleigh Medical Company, of Freeport, Illinois, on credit and at wholesale prices, to sell again to consumers, medicines, extracts, spices, soaps, stock food, and other goods manufactured and put up by it, paying his account for such goods in in-

stallments, as hereinafter provided: Therefore, he hereby agrees to sell no other goods than those sold him by said company, to sell all such goods at regular retail prices to be indicated by it, and to have no other business or employment."

Another clause in the contract provided that the company should notify Minette promptly of any change in the wholesale or retail prices.

Among other defenses interposed by the defendants was that the contract was void, in that the same was made for the sole purpose of maintaining a monopoly in the articles prepared, manufactured, and sold by plaintiff, and that the provisions of said contract and all other contracts made by said plaintiff throughout the different states of the Union, other than the state of its domicile, constituted an unreasonable restraint upon trade and interstate commerce. Under the issues as joined by the pleadings, the defendants assumed the burden of proof, and having introduced their evidence, and rested their case, the plaintiff demurred thereto, and the amount in controversy not being disputed, the court instructed the jury to return a verdict in favor of plaintiff in the sum of $1,212.22, and for interest.

It appears that the plaintiff at the time was the manufacturer of certain medicines, extracts, spices, soaps, perfumes, toilet articles, stock food, and other wares, about 65 in number. The manufactured articles it sold only through contracts similar to that made with the defendant Minette. These contracts were made with numerous parties designated as salesmen or agents for certain exclusive territory, consisting in the present case of three townships in Grady county. At the trial it was agreed that the contracts made by plaintiff in the sale of its goods were identical with the Minette contract, and that it sold its products solely by means of such contracts. That

the business carried on constituted interstate commerce is admitted. Counsel rely largely for a reversal of the judgment upon the following cases: *Dr. Miles Med. Co. v. Park & Sons*, 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502; *Park & Sons v. Hartman,* 153 Fed. 24, 82 C. C. A. 158, 12 L. R. A. (N. S.) 135. Although a number of other authorities are cited in their brief, upon the authority of these cases, it is insisted that the stipulation restricting the price at which sales might be made by Minette and other contract holders, was in violation of the act of Congress of July 2, 1890 (26 Stat. 209, c. 647; U. S. Comp. Stat. 1901, p. 3200), upon the subject of trusts and restraints of interstate trade. Said act, in section 1, declares illegal every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, and also declares it to be a misdemeanor, punishable by fine or imprisonment, or both, for any one to make any such contract, or to engage in any such combination or conspiracy. By section 2 it is also made a misdemeanor, punishable by fine and imprisonment, or both, for any one to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of the trade or commerce among the several states or with foreign nations.

The general rule is well settled that a system of contracts between manufacturers, jobbers, and retailers, by which the manufacturers attempt to control the prices for all sales by all dealers, at wholesale or retail, whether purchasers or subpurchasers, eliminating all competition and fixing the amount which the consumer shall pay, amounts to restraint of trade, and is invalid both at common law and, so far as it affects interstate commerce, under the Sherman Anti-Trust Act. *United States v. Kellogg Toasted*

*Corn Flake Co.* (D. C.), 222 Fed. 725, Ann. Cas. 1916A, 78. No rights are claimed for the plaintiff in the present case, other than those of a manufacturer. Cases, therefore, arising under the patent or copyright statutes, during the term of the lawful monopoly, are not in point, and have no application. The opinion in *Park & Sons v. Hartman,* 153 Fed. 24, 82 C. C. A. 158, 12 L. R. A. (N. S.) 147, by Judge Lurton, followed by the decision of *Dr. Miles Med. Co. v. Park & Sons,* 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502, by Justice Hughes, it would seem, announces a rule which forbids a recovery by plaintiff on its contract. The opinion in the Hartman Case is a comprehensive review of the decisions respecting the common-law rules against monopoly and restraint of trade, as well as the federal Anti-Trust Act, and gives the highest evidence of a painstaking and careful examination of the authorities both at common law and under the statute. Hartman was a manufacturer of certain proprietary medicines, the chief of which was the well-known article called "Peruna." This, with other preparations, Hartman put on the market through a system of contracts intended to maintain prices. Each jobber was required to sign a written agreement to sell only to retailers whose names should be furnished by the complainant, and who had signed a retailer's agreement with him, obligating them to sell only to consumers at a price named by the complainant, or found on his labels and wrappers. It was charged that there had grown up a very large demand for Peruna, and that such contracts had been made with jobbers and wholesalers throughout the United States, and that a majority of the retail druggists of the country had executed such contracts. In the suit brought against Park & Sons, it was sought to enjoin the latter from causing a breach of its sales with its customers, and from procuring from such customers, whether wholesaler or retailer, any

of plaintiff's remedies and medicines, and from advertising, selling, or offering for sale said remedies and medicines obtained in or by any of the means charged at prices less than the established retail prices thereof. The inquiry was made by the court in the course of the opinion:

"Assuming that these contracts operate only as a partial and not a general restraint—a question which we do not concede—and that they are properly to be considered as covenants ancillary to a principal contract, are the restraints thereby imposed necessary to protect the plaintiff in his retained business, or to protect him from an unjust use of the articles by the purchaser?"

—and was answered as follows:

"In the first place, we are to consider that we are not here dealing with a single contract. The complainant has made a multitude of them in identical terms, and the opposite parties comprehend, according to his bill, a large majority of the wholesale and retail druggists in the United States. The reasons which might uphold covenants restricting the liberty of a single buyer might prove quite inadequate when there are a multitude of identical agreements. The single covenant might, in no way, affect the public interest, when a large number might. So, also, the question as to whether the restraint was necessary to the retained business, and therefore ancillary to the principal purpose of the agreement, or whether the restraining covenants were not the principal, rather than the ancillary matter, would largely depend upon the general sweep and result of a multiplication of identical contracts. The general purpose of each separate contract is the regulation of the prices and sales of the line of preparations made by complainant. A common purpose unites each covenantee to every other, and the 'system' is to be construed as 'one piece,' in which the complainant and every assenting dealer, whether wholesaler or retailer, is a party, and the agreement of each such covenantee to sell only at the prices dictated by the manufacturer constitutes one general

scheme. The question here is, therefore, one of a totally different character from that which would arise if the question was the more simple one presented by a breach by a single covenantee"—citing *Continental Wall Paper Co. v. Lewis Voight & Sons*, 78 C. C. A. 567, 148 Fed. 939, 19 L. R. A. (N. S.) 143; *United States v. Addyston Pipe & Steel Co.*, 85 Fed. 275, 29 C. C. A. 141, 46 L. R. A. 122; *W. W. Montague & Co. v. Lowry*, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608.

Further, in discussing the plaintiff's plan of business, the opinion reads:

"The plain effect of the 'system of contracts,' the purposed relation of each to every other being confessed by the very description of the method of carrying on business stated in the bill, is, first, to destroy all competition between jobbers or wholesale dealers in selling complainant's preparations. Complainant restrains himself by agreeing to sell at only one price, and to only such persons as will sign one of his system of contracts. The contracting wholesalers or jobbers covenant that they will sell to no one who does not come within complainant's license to buy, and that they will not sell below a minimum price dictated by complainant. Next, all competition between retailers is destroyed, for each such retailer can obtain his supply only by signing one of the uniform contracts prepared for retailers, whereby he covenants not to sell to any one who proposes to sell again unless the buyer is authorized in writing by the complainant, and not to sell at less than a standard price named in the agreement. Thus all room for competition between retailers, who supply the public, is made impossible. If these contracts leave any room at any point of the line for the usual play of competition between the dealers in the product marketed by complainant, it is not discoverable. Thus a combination between the manufacturer, the wholesalers, and the retailers to maintain prices and stifle competition has been brought about."

It was held that, *prima facie*, the contracts were plainly in restraint of trade, and that it was for the com-

plainant to show that the covenants were not larger than necessary for his protection against an unjust use to the injury of complainant's retained business, and that, unless he could do this, he could not ask equitable relief under such covenants. It was noted that the whole economic system which has made our civilization is founded upon the theory that competition is desirable, and the common-law rules against restraints of trade rest upon that foundation; that a partial restraint of competition may be upheld, when one sells a business or other property, provided that it is no greater than necessary to enable a vendor to realize the value of his good will, or to secure to the buyer the enjoyment of his purchase, or to prevent the use of the property to the prejudice of the seller. Attention was called to the fact that the only competition which the contracts there in question tend to suppress was competition between those who bought his goods to sell again. That the suppression of competition between his vendees and subvendees secured to him the enjoyment of the legitimate fruits of his sale, to which the restrictive covenants were supposed to be ancillary, or to protect him against the unjust competition, it was said, was not clear, and that the bill failed to state facts from which the court could say whether the covenants were necessary and reasonable. Looking to the averments of the bill as a whole, and to the scheme of the business as disclosed by the contracts themselves, it was said the court could not escape the conclusion that the covenants restricting sales and resales had as their prime object the suppression of competition between those who bought to sell again and that any benefit to the retained business to result from them was manifestly but an incident of the main purpose, which was to benefit his vendees and subvendees by breaking down their competition with each other. It was said, further, that re-

straints which might be upheld if ancillary to some princi-
pal contract could not be enforced if, when unmasked, they
appear to be the main purpose of the contract, and not
subordinate, and that in that case the covenants in the
contract signed by the retailers were not even collateral to
any sales by the complainant, but to sales by the whole-
salers, and that their prime purpose was neither the pro-
tection of the retained business of the complainant nor that
of the wholesaler, but only to prevent competition between
retailers. Covenants, it was observed, protecting the seller
of the property against the competition of the buyer, by
its use against the business retained by the seller, which
are upheld if not wider than necessary for that purpose,
have been covenants where the main purpose has been to
protect the seller himself against competition directed
against his retained business. The conclusion of the court
was that the complainant's system of contracts was not
enforceable, and that the direct effect was to limit and
restrain the right of each wholesaler and each retailer to
transact business in the ordinary way.

In *Addyston Pipe & Steel Co. v. United States,* 175 U.
S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, it was held that where
the direct and immediate effect of a contract or combina-
tion among particular dealers in a commodity is to destroy
competition between them and others, so that the parties
to the contract or combination may obtain increased prices
for themselves, such contract or combination amounts to a
restraint of trade in the commodity, even though contracts
to buy such commodity at the enhanced price are continu-
ally being made; that a total suppression of the trade in a
commodity is not necessary in order to render the com-
bination one in restraint of trade; that it is the effect of the
combination limiting and restraining the right of each of

the members to transact business in the ordinary way, as well as its effect upon the volume or extent of the dealing in the commodity, that is regarded.

The Hartman Case was followed by the Supreme Court of the United States in *Dr. Miles Med. Co. v. Park & Sons, supra.* In that case, the complainant, a manufacturer of proprietary medicines, prepared in accordance with secret formulas, presented by its bill a system, carefully devised, by which it sought to maintain certain prices fixed by it for all the sales of its products, both at wholesale and retail. Its purpose was to establish minimum prices at which sales should be made by its vendees, and by all subsequent purchasers who trafficked in its remedies. Its plan was thus to govern directly the entire trade in the medicines it manufactured, embracing interstate commerce as well as commerce within the states, respectively. The defendant was a wholesale drug concern, which had refused to enter into the required contract, and was procuring medicines for sale at "cut prices" by inducing those who had made the contracts to violate the restrictions. The complainant invoked the established doctrine that an actionable wrong was committed by one who maliciously interfered with the contract between two parties, and induced one of them to break that contract to the injury of the other; and that, in the absence of an adequate remedy at law, equitable relief would be granted. The principal question, as stated by the court, was the validity of the restrictive agreements. It was said of the bill that it presented a system of interlocking restrictions by which the complainant sought to control, not merely the prices at which its agents might sell its products, but the prices for all sales by all dealers at wholesale or retail, whether purchasers or subpurchasers, and thus to fix the amount which the consumer should pay, eliminating all competition. It was said:

"That these agreements restrain trade is obvious. That, having been made, as the bill alleges, with 'most of the jobbers and wholesale druggists and a majority of the retail druggists of the country,' and having for their purpose the control of the entire trade, they relate directly to interstate, as well as intrastate, trade, and operate to restrain trade or commerce among the several states is also clear."

It was insisted that the restrictions were not invalid, either at common law or under the act of Congress of July 2, 1890, upon the following grounds: (1) That the restrictions were valid because they related to proprietary medicines manufactured under a secret process; and (2) that apart from this, a manufacturer was entitled to control the prices on all sales of his own product. We dismiss the first contention as not in the present case, but note in passing that it was there expressly decided that a restraint of trade which would be unlawful as to other manufactured articles could not be justified because the article in question was a proprietary medicine, made under a secret formula. To the second, it was urged that as the manufacturer may make and sell or not, as he chooses, he may affix conditions as to the use of the article, or as to the prices at which purchasers may dispose of it; that the propriety of the restraint is sought to be derived from the liberty of the producer. But it was observed by the court that it did not follow, in case of sales actually made, that the manufacturer may impose upon purchasers every sort of restriction. Thus, it was said, a general restraint upon alienation is ordinarily invalid. The right of alienation is one of the essential incidents of a right of general property in movables, and restraints upon alienation have been generally regarded as obnoxious to public policy, which is best subserved by great freedom of traffic in such things as pass

from hand to hand.  Quoting from Lord Coke (2 Coke on Littleton, par. 360), the court said:

"If a man be possessed of a horse or of any other chattel, real or personal, and give or sell his whole interest or property therein, upon condition that the donee or vendee shall not alien the same, the same is void, because the whole interest and property is out of him, so as he hath no possibility of a reverter; and it is against the trade and traffic, and bargaining and contracting between man and man."

Proceeding further in the opinion, it is said:

"With respect to contracts in restraint of trade, the earlier doctrine of the common law has been substantially modified in adaptation to modern conditions.  But the public interest is still the first consideration.  To sustain the restraint, it must be found to be reasonable both with respect to the public and to the parties, and that it is limited to what is fairly necessary, in the circumstances of the particular case, for the protection of the covenantee.  Otherwise restraints of trade are void as against public policy." *Gibbs v. Consolidated Gas Co.*, 130 U. S. 409, 9 Sup. Ct. 553, 32 L. Ed. 984.

It was said that the case was not unlike that of a sale of good will, or of any interest in business, or of a grant of the right to use a process of manufacture; that complainant had not parted with any interest in its business or instrumentalities of production.  It had conferred no right by virtue of which purchasers of its products might compete with it.  It retained complete control over the business in which it was engaged, manufacturing what it pleased, and fixing such prices for its own sales as it desired.  Attention was called to the fact that the court was not dealing with a single transaction, conceivably unrelated to the public interest, but:

"The agreements are designed to maintain prices, after the complainant has parted with the title to the articles, and to prevent competition among those who trade in them."

Continuing, the court said:

"But agreements or combinations between dealers, having for their sole purpose the destruction of competition and the fixing of prices, are injurious to the public interest and void. They are not saved by the advantages which the participants expect to derive from the enhanced price to the consumer"—citing *People v. Sheldon*, 139 N. Y. 251, 34 N. E. 785, 23 L. R. A. 221, 36 Am. St. Rep. 690; *Judd v. Harrington*, 139 N. Y. 105, 34 N. E. 790; *People v. Milk Exch.*, 145 N. Y. 267, 39 N. E. 1062, 27 L. R. A. 437, 45 Am. St. Rep. 609; *United States v. Addyston Pipe & Steel Co.*, 85 Fed. 271, 29 C. C. A. 141, 46 L. R. A. 122; on appeal, *Addyston Pipe & Steel Co. v. U. S.*, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136; *W. W. Montague & Co. v. Lowry*, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608; *Chapin v. Brown Bros.*, 83 Iowa, 156, 48 N. W. 1074, 12 L. R. A. 428, 32 Am. St. Rep. 297; *Craft v. McConnoughy*, 79 Ill. 346, 22 Am. Rep. 171; *W. H. Hill Co. v. Gray & Worcester*, 163 Mich. 12, 127 N. W. 803, 30 L. R. A. (N. S.) 327.

In conclusion it was held that the complainant's plan fell within the principle which condemns contracts of its class; that it in effect created a combination for prohibited purposes, and that no distinction could properly be made by reason of the particular character of the commodity in question, and that it was an article of commerce entitled to no special privilege or immunity, and that the rules concerning the freedom of trade must be held to apply to it; that where commodities have passed into the channels of trade, and are owned by dealers, the validity of agreements to prevent competition and to maintain prices is not to be determined by the circumstances whether they were produced by several manufacturers or by one, or whether they

were previously owned by one or by many; that, the complainant having sold its product at prices satisfactory to itself, the public is entitled to whatever advantage may be derived from competition in the subsequent traffic.

We have reviewed at length the foregoing opinions because of their lucid exposition of the law, and on account of the fact that they involve the construction of a federal statute, and are controlling upon this court. *Missouri, K. & T. Ry. Co. v. Walston,* 37 Okla. 517, 133 Pac. 42. Recurring to the facts of the case at hand, it will be seen that plaintiff's plan or scheme of sale of its manufactured products eliminated all form of competition therein. Its goods were sold only to those who entered into a contract to sell to the consumer at the prices fixed by plaintiff. While but a single contract is involved here, it was admitted that the plaintiff transacted business only in pursuance of like contracts. It was shown that the medical company had a capital and surplus of over $1,000,000 invested in its business, and that an "army of Rawleigh men" was engaged in selling its products throughout the United States. There was no competition in its products between its so-called agents and others, for its sales were confined to those who entered into its restrictive contracts. There was, or could be, no competition between its so-called salesmen, and by no other means than through a purchase from such salesmen could the consumer buy its products. The contracts left no room for the usual competition between the dealers in the products sold by plaintiff; and this was the obvious purpose of the plan. It was not shown, nor can we conceive it to be the case, that the restraints fixed by the manufacturer upon the price to be paid by the consumer were necessary to its retained business, and therefore ancillary to the principal purpose of the agreement; but, on the other hand, the

plain effect of its system of contracts was to destroy all competition in the sale of its manufactured products. Well may we in this connection use the language of the court in the Hartman Case:

"Now, in what way is only a fair protection afforded the interests of complainant by stifling all competition between the jobbers of the United States who deal in complainant's preparations? In what way are the covenants which forbid them to resell to any one who will buy 'necessary,' to use Judge Taft's phrase, 'to protect the covenantee in the enjoyment of the legitimate fruits of the contract or to protect him from the dangers of an unjust use of those fruits by the other party?' In what way are covenants which compel retailers to maintain prices, to quote Chief Justice Tindal, 'such only, as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public?' *Horner v. Graves,* 7 Bing. 735."

To sustain the validity of the restrictive agreements of plaintiff would be to give effect to a system of doing business by which all the sales of all its products would be, under all circumstances, controlled by it. Applied to modern conditions, the public interest is of first importance in determining the validity of contracts in restraint of trade. If the restraint is sustained, it can only be in cases where it is found to be reasonable both with respect to the public and to the parties, and where it is limited to what is fairly necessary in the circumstances of the particular case, for the protection of the covenantee. The fact that here there was no agreement between different manufacturers, wholesalers, jobbers, or others to fix and maintain a selling price is, in the language of Justice Hughes, in the Dr. Miles Case, unimportant. In that case it was said:

"The bill asserts the importance of a standard retail price, and alleges generally that confusion and damage

have resulted from sales at less than the prices fixed. But the advantage of established retail prices primarily concerns the dealers. The enlarged profits which would result from adherence to the established rates would go to them, and not to the complainant. It is through the inability of the favored dealers to realize these profits, on account of the described competition, that the complainant works out its alleged injury. If there be an advantage to the manufacturer in the maintenance of fixed retail prices, the question remains whether it is one which he is entitled to secure by agreements restricting the freedom of trade on the part of dealers who own what they sell. As to this, the complainant can fare no better with its plan of identical contracts than could the dealers themselves if they formed a combination and endeavored to establish the same restrictions, and thus to achieve the same result, by agreement with each other. If the immediate advantage they would thus obtain would not be sufficient to sustain such a direct agreement, the asserted ulterior benefit to the complainant cannot be regarded as sufficient to support its system."

As we read the decisions principally relied on, the plaintiff's plan of selling its products comes within the inhibition of the statute. Contracts which by reason of the intent, or the inherent nature of the contemplated acts, prejudice the public interest by unduly restricting competition or unduly obstructing the course of trade are within the act. *United States v. American Tobacco Co.*, 221 U. S. 179, 31 Sup. Ct. 632, 55 L. E. 694; *Nash v. United States*, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232.

But may the defendants avail themselves of the statute in an action to recover for goods sold Minette? Plaintiff's recovery is predicated upon the illegal agreement. The contract is referred to and made the basis of its cause of action. Aside from the contract, there was no liability on the part of the guarantors. Against them, plaintiff had no

claim, except through the medium of an illegal agreement. In short, the account sued on was made up in execution of the agreement that constituted the illegal restraint upon trade and commerce, and was not, therefore, as in some of the reported cases, collateral to and independent of the agreement under which the combination or restraint was effected. Plaintiff could not enforce its contract without bringing under review all its parts, for it is well settled that where it is necessary to prove an illegal contract in order to maintain an action, courts will not enforce it, nor will they enforce alleged rights directly springing from such contract. As stated in *McMullen v. Hoffman,* 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117:

"Upon the point as to the ability of the plaintiff to make out his cause of action without referring to the illegal contract, it may be stated that the plaintiff for such purpose cannot refer to one portion only of the contract upon which he proposes to found his right of action, but that the whole of the contract must come in, although the portion upon which he founds his cause of action may be legal"—citing *Booth v. Hodgson,* 6 T. R. 405, 408; *Thompson v. Thomson,* 7 Ves. J. 740; *Embrey v. Jemison,* 131 U. S. 336, 348, 9 Sup. Ct. 776, 33 L. Ed. 172, 177.

Turning to the authorities declaring when the statute may be set up in defense of an action to recover for goods sold, it appears that in *Connolly v. Union Sewer Pipe Co.,* 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679, there was no necessary legal connection between the sale of pipe to the defendants by the plaintiff corporation and the alleged arrangement made by it with other corporations, companies, and firms. The contracts under which the pipe in question was sold were, as held by the court, collateral to the arrangement for the combination referred to, and the action was not one to enforce the terms of such an arrangement. In *E. Bement & Sons v. National Harrow Co.,*

186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058, the court, after referring to that section of the act of Congress relating to suits by the Attorney General and by persons injured in their business or property, said:

"Assuming that the plaintiff is right so far as regards any suit brought under that act, we are, nevertheless, of opinion that any one sued upon the contract may set up as a defense that it is a violation of the act of Congress, and if found to be so, that fact will constitute a good defense to the action.  *  *  *  As the statute makes the contract in itself illegal, no recovery can be had upon it when the defense of illegality is shown to the court."

A leading authority, giving to the purchaser the right to defend, under the statute, on account of the unlawful nature of the contract, is *Continental Wall Paper Co. v. Voight & Sons*, 212 U. S. 227, 29 Sup. Ct. 280, 53 L. Ed. 486. In that case the action was brought to recover for wall paper sold by the representative of a combination or trust formed for the purpose of restraining and monopolizing trade and commerce among the several states in the manufacturing, buying, selling, and dealing in wall paper. The defendant, who was engaged in buying and selling wall paper in Ohio and other states, was a party to the illegal combination; and the account in suit was made up, as to the prices and terms of sale, not upon the basis of an independent collateral contract, for goods sold and delivered, but with direct reference to, in conformity with, and for the object of enforcing the agreement that constituted, or out of which came, the illegal combination, whose business was carried on under the name of the Continental Wall Paper Company, and a judgment against the defendant upon the account in suit would, in effect, legally and practically aid the combination to reap the fruits of agreements that were illegal under the act of Congress,

and the making of which was declared by that act to be a crime. The Connolly Case is reviewed at length by Justice Harlan, who wrote both opinions, and the cases distinguished. Of the case there at hand, it was said:

"The present suit is not based upon an implied contract of the defendant company to pay a reasonable price for goods that it purchased, but upon agreements, to which both the plaintiff and the defendant were parties, and pursuant to which the accounts sued on were made out, and which had for their object, and which it is admitted had directly the effect, to accomplish the illegal ends for which the Continental Wall Paper Company was organized. If judgment be given for the plaintiff, the result, beyond all question, will be to give the aid of the court in making effective the illegal agreements that constituted the forbidden combination."

The last expression of the Supreme Court of the United States upon the question is *Wilder Manufacturing Co. v. Corn Products Refining Co.*, 236 U. S. 165, 35 Sup. Ct. 398, 59 L. Ed. 520, Ann Cas. 1916A, 118, in which the court reviews both its earlier holdings in the Connolly and Continental Wall Paper Company Cases. The primary question there decided was that the defendant could not set up in defense the illegal organization of the seller, the contract being otherwise inherently legal. Having dealt with the refining company as an existing concern, possessing the capacity to sell, speaking generally, the assertion that it had no legal existence because it was an unlawful combination in violation of the anti-trust act was irrelevant to the question of the liability of the manufacturing company to pay for the goods, since such defense was a mere collateral attack on the organization which could not lawfully be made.

In *J. W. Ripy & Son v. Art Wall Paper Co.*, 41 Okla. 20, 136 Pac. 1080, 51 L. R. A. (N. S.) 33, the contract

under review did not undertake to fix the price at which the defendants might sell the goods purchased; neither did it restrict the plaintiff from selling goods to others, nor was either party restricted from selling goods to any other person or class of persons. And it was observed that it could not be seen wherein the public would be injuriously affected by the enforcement of the contract.

The fact that in a few isolated cases Minett varied slightly from the selling price fixed by the plaintiff does not serve to render enforceable the contract following which the bill of goods was made up, and for the value of which the action is brought to recover. Plaintiff may not avail itself of its patron's infraction of his contract in order to give character to its illegal undertaking.

From the facts proven, and without further citation of authorities, we conclude that the contract entered into between the parties was illegal under the anti-trust act of 1890, that it is to be taken as one intended, and which, if enforced, would have the effect, directly to restrain and monopolize trade and commerce among the several states, and that plaintiff cannot have a judgment for the amount of the account sued on, because, for the reasons we have already stated, such a judgment would, in effect, aid the execution of the agreements which constituted the illegal combination.

The judgment of the trial court is therefore reversed.

All the Justices concur.