**FURST et al. v. LUCAS et al.**

No. 24406.    Sept. 29, 1936.

W. H. Cooper, Bryan Phillips, and R. E. Bowling, for plaintiffs in error.

Melton & Melton, for defendants in error.

BUSBY, J. This action was instituted in the district court of Caddo county on the 17th day of July, 1931, by Frank E. Furst and Fred G. Thomas, copartners doing business under the firm name of Furst & Thomas, of Freeport, Ill., as plaintiffs, against T. F. Lucas of Ft. Cobb, Okla., T. S. Churchill, and Ed Foster, as defendants. The plaintiffs sought to recover a money judgment in the sum of $1,294.64. The liability of the defendant T. F. Lucas was said to have arisen out of a written contract executed between him and the plaintiffs whereby the plaintiffs had agreed to sell to him at regular who'esale prices on credit certain goods and merchandise in which they were dealing consisting of various and sundry articles known as F. W. Van Ness sanitary products. The purpose of the contract was to

enable the defendant T. F. Lucas to continue in the business of retailing such products. Apparently the retail business was conducted by the defendant Lucas by house to house canvass, sale, and delivery. This action was for the amount due for goods sold and delivered pursuant to the foregoing agreement.

The liability of the defendants T. S. Churchill and Ed Foster was claimed because of a separate instrument of guaranty attached to the above-mentioned contract which they signed, whereby they jointly and severally guaranteed the payment of the indebtedness of the defendant Lucas under the contract. The defendant T. F. Lucas filed a separate answer; the defendants T. S. Churchill and Ed Foster filed a joint answer.

The case was tried to a jury in the lower court and resulted in a verdict in favor of the defendants. The plaintiffs present the case to this court on appeal, appearing herein as plaintiffs in error. We shall continue to refer to the parties by their trial court designations.

Our attention is first directed to a motion to dismiss for the reason that one of the defendants died on November 29, 1934, and left as his heirs his wife, Mattie Churchill, together with a son and two daughters, and that more than a year has elapsed since the death of T. S. Churchill and no revivor of this cause has been had and the time in which to revive same has expired. We are of the opinion, and hold, that the motion should be denied for the reason that it is not necessary to revive as to the said defendant in error. The cause was filed in this court January 21, 1933. The judgment sought was joint and several. In Harrod v. Adams, 101 Okla. 150, 224 P. 306, this court had before it an appeal from a joint judgment. The syllabus is as follows:

"Where plaintiff in error appeals from a judgment rendered against him in the district court in favor of joint defendants, and one of the defendants in error dies pending the proceedings in error in the Supreme Court, and the action is not revived within the time prescribed by section 5294, Rev. Laws 1910, the appeal will be dismissed."

In Johnson v. Alexander, 54 Ok'a. 160, 153 P. 627, plaintiff obtained a judgment and defendant appealed. After the petition in error was filed, William Alexander, the sole plaintiff, died. As a matter of course a revivor was necessary. The remaining cases cited by movant on motion to dismiss are Hester v. Gilbert, 43 Okla. 400, 143 P. 189; Young v. Clifford, 143 Okla. 84, 291 P. 25; Farmers State Bank v. Williamson, 151 Okla.

105, 1 P. (2d) 377; Hollands v. Hollands, 160 Okla. 197, 16 P. (2d) 574. These cases all involve the question of where a sole defendant in error died after the petition in error was filed and no revivor was had.

We do not find in the cases cited by the defendant in error nor does our research reveal a case directly in point to the effect that where one of the defendants in error against whom a joint and several judgment was sought and no judgment obtained, died after the petition in error has been filed in this court, a revivor is or is not necessary. In Ranney-Alton Mercantile Co. v. Hanes, 9 Okla. 471, 60 P. 284, it was held:

"Where an appeal is taken from a decision of the district court, and it appears that the parties in whose favor judgment was rendered were in fact partners, and the property in controversy in the district court was partnership property, the service of the summons in error upon one partner perfects the appeal notwithstanding the pleadings may be entitled in the individual names of the partners; and, in case of the death of one of said partners pending the appeal to this court, it will not be necessary to make his personal representatives parties to the action."

In Means v. Terrell, 158 Okla. 146, 12 P. (2d) 699, the court in passing upon a motion to dismiss used the statement that where one defendant in error, not necessary to the appeal, dies, the order of revivor is not required. But the facts in that case reveal that defendant in error about which the court was speaking was one who had conveyed all the interest that he held in the subject-matter of the action, and that case is not an authority upon the question. In Holmes v. Alexander, 52 Okla. 122, 152 P. 819, it was stated that:

"Where in an action against a partnership, service is made by publication and the appearance is by the partnership only, and judgment is rendered against the individuals composing the firm, and, pending the appeal, one of the partners dies, held, a failure to revive in the name of his personal representatives is not fatal to the appeal, inasmuch as the trial court was without jurisdiction to render an individual judgment against the deceased."

These cases involve all of the cases which we have been able to find in this jurisdiction relative to the necessity of reviving a cause in the Supreme Court where one of the defendants in error has died subsequent to the filing of the appeal and the judgment against the defendants in error was either joint or several or the judgment sought was joint or several.

The rule is general if not universal that all parties against whom a joint judgment is rendered must be made parties either as plaintiffs or defendants to a proceeding in error to reverse the judgment. Hughes v. Rhodes, 25 Okla. 172, 105 P. 650; Long v. Bearden, 58 Okla. 653, 160 P. 467.

We are also not unmindful of the pronouncement of this court in certain cases that all parties whose rights may be affected by reversal or modification of a judgment appealed from are necessary parties in the appellate court. City of Lawton v. Burnett, 72 Okla. 205, 179 P. 752; Arkansas Valley Nat. Bank v. McCollom, 64 Okla. 3, 165 P. 193. These cases, if not modified, actually were in effect restricted in the recent case of City of Sapulpa v. Young, 147 Okla. 179, 296 P. 418, in which this court held that any one of the defendants may appeal without making other defendants parties where there was no adverse interest between them, and held that a case-made did not have to be served upon the defendants, in a tort action, who had been dismissed from the case in the trial court by the action of the court in sustaining a demurrer to the evidence where the appeal involved the judgment obtained by the plaintiff against the municipality primarily liable. In that case we said:

"* * * And if the judgment is a joint judgment or if any other party brought into this court by the notice of appeal has an interest in upholding the judgment or decree sought to be reversed, the case-made should be served upon such party or parties, but, if the judgment be several, **then any party to the several judgment may appeal by serving notice upon the party or parties adverse to him in the judgment appealed from.**" (Emphasis ours.)

This statement was made in connection with the service of a case-made upon the adverse party. But it serves to limit the rule to what is a necessary party in considering who should be made parties on appeal under the definition of adverse party. This statement in City of Sapulpa v. Young, supra, in connection with the statement contained in the above-cited authorities to the effect that no revivor is necessary unless the party who has died is necessary to the determination of the case, leads to the logical conclusion that if the appeal could have been perfected against the remaining defendants, or if death does not abate the judgment, then it is not necessary that there be a revivor in this court, although a revivor might be proper. It will not be contended that had the defendant died while the action

was pending in the trial court and no appeal been perfected after the judgment had been rendered against the defendants, a revivor of that judgment would be necessary in order to render it effective against the remaining defendants. See Gillespie v. First National Bank, 20 Okla. 768, 95 P. 220. If the defendant in error was not necessary to the validity of the judgment in the trial court, said defendant in error is not a necessary party to the proceeding in error in this court. The motion to dismiss must therefore be denied.

In the presentation of their case to the court below the defendants took the position, among other asserted defenses, that the written instrument upon which this suit was brought was void and not enforceable, because, as they asserted, the contract between the plaintiffs and the defendant T. F. Lucas undertook to fix the retail price at which the goods should be sold. It was asserted that this constituted a violation of the federal Sherman Anti-Trust Act (Act Cong. July 2, 1890, chap. 647, 26 Stat. 209, U. S. Comp. Stat. 1916, sec. 8820).

The sole issue submitted by the trial court to the jury was whether the plaintiffs under their contract fixed and controlled the retail prices at which the goods were to be sold. The plaintiffs in this appeal urge that the trial court improperly submitted the issue above mentioned to the jury. They say that the evidence was insufficient to support the defenses urged and that the instructions under which the issue was submitted were inappropriate.

In support of the judgment of the trial court and in answer to the plaintiffs' contention, the defendants invoke the rule recognized by this court that attempts on the part of manufacturers to control the resale prices of the whole or a substantial part of their products through contracts with wholesalers and dealers, which contracts purport to maintain a fixed retail price by agreement not to sell at a different price, constitute a violation of the federal anti-trust and monopoly law. The defendants also invoke the corollary principle that contracts which form an integral part of such scheme are illegal and against public policy; that by reason of such illegality courts will not lend their aid to the enforcement thereof and will not render judgment for the purchase price of goods sold pursuant thereto. See Stewart v. W. T. Rawleigh Med. Co., 58 Okla. 344, 159 P. 1187; Brooks v. J. R. Watkins Med. Co., 81 Okla. 82, 196 P. 956; Hunt v. W. T. Rawleigh Med. Co., 71 Okla. 193, 176 P. 410.

Compare Long v. Furst, 171 Okla. 489, 44 P. (2d) 74; Gordon v. W. T. Rawleigh Co., 117 Okla. 235, 245 P. 825.

The underlying principle upon which the contracts alluded to are condemned under the law is that a scheme embracing such contracts and agreements has a tendency towards the creation of a monopoly and operates to prevent competition between dealers, thereby depriving the public in general of the benefit of such competition.

The federal legislation upon this subject does not stand alone. The practice was disapproved by the common law in the absence of statute. This state has enacted legislation dealing with the subject. See section 11017 et seq., C. O. S. 1921. Similarly, monopolies are condemned by our state Constitution. Article 2, sec. 32, Okla. State Const.

We allude to these various provisions of law concerning monopolies and contracts in restraint of trade to demonstrate the general policy of the law. However, it appears that the parties to this case, that is, the defendants herein, rely solely upon the federal legislation to support the judgment of the trial court, and what we have to say in this opinion deals peculiarly with the development of the law relating to interstate commerce as regulated by the acts of Congress and interpreted by the federal courts.

The declarations of law as contained in the decisions of this court previously mentioned rested upon consideration of the then existing expressions of the federal courts upon the subject. There have been, however, some important treatments of this subject by the United States Supreme Court which have not been taken into consideration in our previous opinions. In this connection it is important to mention the case of United States v. Colgate & Co., 250 U. S. 300, 63 L. Ed. 992, 39 Sup. Ct. Rep. 465, 7 A. L. R. 443, in which it was pointed out that:

"In the absence of any purpose to create or maintain a monopoly, the act (the Sherman Anti-Trust Act) does not restrict the long-recognized right of trader or manfacturer engaged in in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell."

The cited case affirmed the principle that a manufacturer or wholesaler could announce in advance to a dealer that in the exercise of his privilege to deal with whom he pleases he would refuse to sell goods to such dealer if the dealer resold below suggested prices. But it is important to notice

in connection with this expression by the Supreme Court of the United States that the right thus recognized could not be used as an instrumentality of maintaining monopoly.

Some confusion arose out of the application of the rule announced in the Colgate Case until the subsequent expression upon the subject by the same court in the case of United States v. A. Schrader's Son, Inc., 64 L. Ed. 471, in which it was said in discussing the Colgate Case:

"It seems unnecessary to dwell upon the obvious difference between the situation presented when a manufacturer merely indicates his wishes concerning prices and declines further dealings with all who fail to observe them, and one where he enters into agreements—whether express or implied from a course of dealing or other circumstances—with all customers throughout the different states, which undertake to bind them to observe fixed resale prices. In the first, the manufacturer but exercises his independent discretion concerning his customers, and there is no contract or combination which imposes any limitation on the purchaser. In the second, the parties are combined through agreements designed to take away dealers' control of their own affairs, and thereby destroy competition and restrain the free and natural flow of trade amongst the states."

In the later case of Federal Trade Commission v. Beech-Nut Packing Co., 66 L. Ed. 307, 42 Sup. Ct. 150, 19 A. L. R. 882, it was said by the same court, in discussing the Sherman Anti-Trust Act and subsequent congressional legislation upon the same subject, that:

"The circuit court of appeals was of opinion that the only difference between the price-fixing policy condemned as unlawful in Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U. S. 373, 55 L. Ed. 502, 31 Sup. Ct. Rep. 376, and the price-fixing plan embodied in the Beech-Nut policy, was that, in the former case, there was an agreement in writing, while in this case the success or failure of the plan depended upon a tacit understanding with purchasers and prospective purchasers. While it expressed its difficulty in seeing any difference between a written agreement and a tacit understanding in their effect upon the restraint of trade, it, nevertheless, regarded the case as governed by the decision of this court in United States v. Colgate & Co., 250 U. S. 300, 63 L. Ed. 992, 7 A. L. R. 443, 39 Sup. Ct. Rep. 465, and, accordingly, held that the commission had exceeded its power in making the order appealed from."

And at a later point in the opinion:

"The system here disclosed necessarily constitutes a scheme which restrains the natural flow of commerce and the freedom of competition in the channels of interstate trade which it has been the purpose of all the anti-

trust acts to maintain. In its practical operation it necessarily constrains the trader, if he would have the products of the Beech-Nut Company, to maintain the prices 'suggested' by it. If he fails to do so, he is subject to be reported to the company, either by special agents, numerous and active in that behalf, or by dealers whose aid is enlisted in maintaining the system and the prices fixed by it. Furthermore, he is enrolled upon a list known as 'Undesirable—Price Cutters,' to whom goods are not to be sold, and who are only to be reinstated as one whose record is 'clear,' and to whom sales may be made, upon his giving satisfactory assurance that he will not resell the goods of the company except at the prices suggested by it, and will refuse to sell to distributors who do not maintain such prices. From this course of conduct a court may infer, indeed, cannot escape the conclusion, that competition among retail distributors is practically suppressed, for all who would deal in the company's products are constrained to sell at the suggested prices."

For the purpose of the case at bar the important feature of federal decisions upon the subject is the underlying principle of monopoly. It is to be observed that a single isolated transaction by which a wholesaler or manufacturer attempts to control the price of goods is not necessarily condemned by law. But if such a contract or agreement, express or implied, is a part of a general scheme which has a tendency towards monopoly, it comes within the condemnation of the legislation. It is not to be understood that we are holding valid a stipulation in a contract between seller and buyer fixing the price at which a chattel shall be resold. Such a stipulation may be invalid as inconsistent with complete ownership, but it may not be illegal as distinguished from invalid. These questions are not discussed in this opinion because they are not briefed.

Bearing in mind the principles surrounding the federal legislation on the subject, we turn to a detailed consideration of the facts established in this case and the instructions by which those facts were submitted to the jury in the trial court.

It appears that the plaintiffs, Furst and Thomas, who are copartners, are wholesalers with their place of business at Freeport, Ill. They deal in a brand of goods known as F. W. Van Ness sanitary products, consisting of patent medicines and other sundry items. They term themselves "distributors" for these products. It does not appear from the record now before us whether they are the exclusive distributors or only one of several such distributors.

By the terms of the written agreement executed between themselves and T. F. Lucas they undertook to extend to him credit for the purpose of buying their products at regular wholesale prices as his needs should require. This contract on its face is entirely free from any stipulation concerning the fixing of prices at resale. It does, however, preserve the right of the vendors or plaintiffs to terminate the agreement and refuse to sell further goods and provides, in substance, that weekly reports on the business conducted by Lucas should be transmitted to the plaintiffs. In the trial of this case it was shown by the defendants that this contract was of the same form that was used by the plaintiffs with their other dealers in Oklahoma. This testimony, however, was insufficient to establish any general scheme of price fixing for the reason that the contract was, as we have noted, free from stipulations which gave the distributor power to fix prices. The defendant Lucas also established on the trial of the case that from time to time and in connection with the various orders of goods that were shipped to him suggested retail prices were transmitted. In wording these suggestions the plaintiffs were very careful to avoid any suggestion that the retail prices therein contained were obligatory on the dealer. For example, the first paragraph of a memorandum accompanying the suggested prices read as follows:

"As a help to new dealers we have indicated the usual and customary retail selling price for each article in this vicinity. You should not understand from this, however, that we are attempting to fix or dictate the price at which you shall sell your goods to your customers. After you have bought the goods and paid us our wholesale price for them, our control over them ceases and you can sell them at whatever price you choose or even give them away if you wish."

It was also shown by the defendants' oral testimony that in making his weekly reports there was a blank space left to fill in the retail prices at which he had sold the goods. Defendant Lucas also testified that he had received some other communication from the plaintiff company more directory in form concerning the prices at which he should resell his goods. This communication, however, had been lost and was not produced in evidence.

In support of their case the defendants also produced the testimony of another dealer who had operated under a similar contract with the plaintiff company who was unable to produce his written communications with the defendant company, but who testified

orally to the substance thereof. This witness stated that after he had quit doing business with the company he had some goods left on hand which he proposed to sell at cut prices and the company had objected to his selling them at such prices.

In substance, then, we have before us a case in which the wholesaler, who is not shown to be an exclusive distributor, has entered into written contracts with various dealers in Oklahoma, which written contracts are entirely free from obnoxious price-fixing stipulations. In order to show a monopoly two witnesses testified to a state of facts which has a tendency to indicate that, as to their individual dealing with the company, there was a kind of implied understanding as to the prices at which the goods would be resold. This testimony is no doubt competent as bearing upon the existence of a monopoly for price-fixing purposes. The question of whether or not it was sufficient in itself to withstand an attack need not be considered in this appeal because of our view upon the instructions given the jury. The testimony certainly was not sufficient to conclusively establish the existence of a general price-fixing scheme. The trial court could not rightfully, by reason of the meagerness of the evidence and the limited scope thereof on price-fixing features, assume that the course of dealing between the plaintiff company and all of its other dealers was the same as the course of dealing between the plaintiff company and the two dealers who testified. In other words, there was no proof of an implied understanding to fix prices between the plaintiffs and their dealers except as to the two dealers who testified.

In submitting the issue to the jury the trial court instructed as follows:

"In this connection if you believe by the greater weight of the evidence that the plaintiffs herein, that is, Furst and Thomas, made a contract with Lucas, even though it was one for an absolute sale of the goods, and fixed and controlled the price at which said goods were to be sold to the retail trade, then it would be your duty to find for the defendants. But if this was a sale straight out and under the understanding between the parties Mr. Lucas had a right to sell the goods to whom he pleased and for whatever price he pleased, then it would not be a contract in violation of law, and under the evidence in this case if it is not an invalid contract you should find for the plaintiffs for the sum of $1,294.64; but if you find that under the arrangement they made in the handling of this business they were to fix the prices and did fix the prices, or it was the understanding they were to fix the retail prices at which he was to sell the goods, then it is an invalid contract."

An examination of this instruction discloses that the jury was authorized to find for the defendants upon the mere determination that there was a single agreement between the plaintiffs and Lucas to fix prices of the goods sold to him. The necessity of that agreement being a part of the general monopolistic scheme for the same purpose was not recognized. This was an essential element of defendants' defense under the decisions of the federal courts construing and applying the act.

It may be mentioned at this point that the proof introduced in this case bears a striking similarity to the proof produced in the case of Brooks v. J. R. Watkins Med. Co., supra, in which a result opposite to the one herein announced was approved. However, the Brooks Case failed to take into consideration the later expressions of the Supreme Court of the United States as previously reviewed in this opinion. It is extremely doubtful if the proof in that case would be sufficient to meet the tests created by the later expressions of the highest federal court, at least, unless the proof as reflected upon the face of the opinion in that case was supplemented by other proof appearing in the record therein but not disclosed in the opinion.

The learned trial court was evidently following the Brooks Case as to the sufficiency of the proof. However, since this case involves federal legislation, we feel impelled to regard that case as modified by the later expressions of the Supreme Court of the United States.

This case is therefore reversed for a new trial by reason of the failure of the trial court in its instructions to require the jury to consider the monopolistic features, if any, of the general scheme involved.

We are not passing upon the sufficiency of the evidence to go to the jury, since in a retrial of this case additional evidence may be introduced.

Reversed and remanded.

McNEILL, C. J., OSBORN, V. C. J., and WELCH, PHELPS, CORN, and GIBSON, JJ., concur. RILEY, J., dissents.